JHT:cjn
AO 106 (Rev. 04/10) Application for a Search Warrant

2021R00210

# UNITED STATES DISTRICT COURT
for the
District of Minnesota

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE SINGLE-FAMILY HOME LOCATED AT 13299 BRONZE PARKWAY, ROSEMOUNT, MINNESOTA 55068, AS FURTHER DESCRIBED IN ATTACHMENT A-2 | **SEALED BY ORDER OF THE COURT**<br><br>Case No. 22-MJ-040 TNL |

## APPLICATION FOR A SEARCH WARRANT

I, Travis Wilmer, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**See Attachment A-2, incorporated here**

located in the State and District of Minnesota, there is now concealed:

**See Attachment B-2, incorporated here**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

| | |
|---|---|
| X | evidence of a crime; |
| X | contraband, fruits of crime, or other items illegally possessed; |
| X | property designed for use, intended for use, or used in committing a crime; |
| | a person to be arrested or a person who is unlawfully restrained. |

The search is related to a violation of:

| _Code Section_ | _Offense Description_ |
|---|---|
| Title 18, United States Code, Section 1341 | Mail Fraud |
| Title 18, United States Code, Section 1343 | Wire Fraud |
| Title 18, United States Code, Section 1349 | Conspiracy |
| Title 18, United States Code, Section 1956, 1957 | Money Laundering |

The application is based on these facts:

**See Affidavit, incorporated here**

   X     Continued on the attached sheet.

_____
*Applicant's Signature*

SUBSCRIBED and SWORN before me by reliable electronic means (FaceTime, Zoom and/or email) pursuant to Fed. R. Crim. P. 41(d)(3)

Date: Jan. 14, 2022

Travis Wilmer, Special Agent
Federal Bureau of Investigation
*Printed Name and Title*

_____
*Judge's Signature*

City and State: Minneapolis, MN

The Honorable Tony N. Leung
United States Magistrate Judge
*Printed Name and Title*

GOVERNMENT
EXHIBIT

B

22-cr-223 (NEB/TNL)

STATE OF MINNESOTA    )
                           )    ss.    AFFIDAVIT OF TRAVIS WILMER
COUNTY OF HENNEPIN    )

Your affiant, Travis Wilmer, being duly sworn, does state the following is true and correct to the best of his knowledge and belief:

1.    I have been employed as a Special Agent with the Federal Bureau of Investigation (FBI) since November 8, 2021.

2.    As a Special Agent, my primary duties and responsibilities consist of conducting investigations of individuals and businesses for possible violations of federal laws. I am presently assigned to the FBI's Minneapolis, Minnesota field office where I am a member of the Civil Rights and Public Corruption Squad.

3.    During my employment as a Special Agent, I have conducted and participated in investigations of varying degrees involving mail fraud, wire fraud, fraud against the government, money laundering, and other criminal acts, including criminal schemes where individuals misappropriate money from the investing public. Furthermore, in the course of my training and experience, I have become familiar with the types of records businesses typically maintain in the course of their regular activity, including ledgers, journals, invoices, receipts, and bank documents.

4.    Based upon my work experience and training, as well as discussions with law enforcement agents, I know that:

    a.    Businesses generally maintain or keep journals, ledgers, bank statements and records, receipts, invoices and other documents evidencing the

receipts and disbursements of funds, inventories, assets of the business and personnel information. These records are usually kept and maintained for extended periods of time, often several years, at the place of business or residence. I know from previous investigations that such records are also often maintained at the residence of subjects.

b.      Individuals, including those receiving income from fraud schemes, often maintain within their residence records of assets and financial transactions. These items often include financial statements, receipts, invoices, bank statements and records, bank money order and cashier's check receipts, property records, investment records, assets, stock and bond records, tax records, correspondence, diaries, and handwritten notes. These records are often maintained for extended periods of time, often several years.

c.      Due to the increasing prevalence of electronic communications and storage, paper records can be converted and stored electronically. As a result, any record or document could be found in either paper or electronic format.

d.      Almost all wire transfers, even intrastate wire transfers, cross state lines.

5.    This affidavit is submitted in support of an application for warrants to search:

a.      The office located at 3055 Old Highway 8, Suites 312 and 229, Saint Anthony, Minnesota 55418, as further described in Attachment A-1 ("**Subject Premises 1**");

2

     b.    The single-family home located at 13299 Bronze Parkway, Rosemount, Minnesota 55068, as further described in Attachment A-2 ("Subject Premises 2");

     c.    The office suite located at 1506 Southcross Drive West, Burnsville, Minnesota 55306, as further described in Attachment A-3 ("**Subject Premises 3**");

     d.    The office located at 3249 Hennepin Avenue South, Unit 75, Minneapolis, Minnesota 55408, as further described in Attachment A-4 ("**Subject Premises 4**"); and

     e.    The single-family home located at 15101 County Road 5, Burnsville, Minnesota 55306, as further described in Attachment A-5 ("**Subject Premises 5**");

     f.    The office located at 2854 Columbus Avenue South, Minneapolis, Minnesota 55407, as further described in Attachment A-6 ("**Subject Premises 6**") (collectively, the "**Subject Premises**");

for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1341 (mail fraud), 1343 (wire fraud), 1349 (conspiracy), and 1956/1957 (money laundering).

     6.    This affidavit is based on my personal knowledge, interviews of witnesses, physical surveillance, information received from other law enforcement agents, my experience and training, and the experience of other agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause in

support of a search warrant for the Subject Premises, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, instrumentalities, and fruits of violations of Title 18, United States Code, Sections 1341, 1343, 1349, and 1956/1957 are located at the Subject Premises.

## I.   OVERVIEW

7.     In recent years, individuals and companies in Minnesota have engaged in a large-scale scheme to fraudulently obtain and misappropriate federally funded child nutrition programs. The scheme was carried out by individuals who owned and operated companies purportedly in the business of providing federally funded free meals to underprivileged children and adults, including during the global Covid-19 pandemic. The companies and their owners received tens of millions of dollars in federal funds for use in providing nutritious meals to underprivileged children and adults. Almost none of this money was used to feed children. Instead, the participants in the scheme misappropriated the money and used it to purchase real estate, cars, and other luxury items. To date, the conspirators have stolen millions of dollars in federal funds. The scheme is ongoing.

## II.   LOCATIONS TO BE SEARCHED

### A.     Subject Premises 1

8.     **Subject Premises 1** is the office of Feeding Our Future located at 3055 Old Highway 8, Suites 229 and 312, Saint Anthony, Minnesota 55418.

9.     During the investigation, the government obtained a federal search warrant for the contents of an email account used by Aimee Bock to conduct business

on behalf of Feeding Our Future. A review of these emails showed that Aimee Bock sent and received hundreds of documents identifying **Subject Premises 1** as the office location of Feeding Our Future. These documents included correspondence with the Minnesota Department of Education related to the company's participation in federal child nutrition programs.

10. U.S. Postal Service records show that Feeding Our Future regularly receives mail at **Subject Premises 1**, including mail from the Minnesota Department of Education and various banks. On or about January 13, 2022, an FBI agent conducted surveillance at Subject Premises 1. The agent saw the mailboxes located in the lobby of the building. The boxes for Suites 312 and 229 were both labeled "Feeding Our Future."



11. FBI surveillance agents have regularly observed a Volkswagen Atlas SUV bearing Minnesota license DVN 744 parked outside of the **Subject Premises 1**, including on January 12, 2022. Minnesota Department of Motor Vehicles records show that this car is registered to Aimee Bock.

12. The door to Suite 312 has signs indicating that the suite is used by Feeding Our Future.

5

**B.     Subject Premises 2**

13.     **Subject Premises 2** is the single-family home located at 13299 Bronze Parkway, Rosemount, Minnesota 55068. **Subject Premises 2** is the residence of Aimee Bock, the President of Feeding Our Future. It is also a mailing address used by Feeding Our Future.

14.     Dakota County property records show that Aimee Bock owns **Subject Premises 2**.

15.     According to Minnesota Department of Motor Vehicles, Aimee Bock lives at **Subject Premises 2**.

16.     FBI surveillance agents have regularly observed the Volkswagen Atlas SUV registered to Aimee Bock parked in the driveway of **Subject Premises 2**, including on January 13, 2022.

17.     According to Minnesota Secretary of State records, Feeding Our Future was incorporated in November 2016. Aimee Marie Bock is listed as the President of the company. **Subject Premises 2** is listed as Feeding Our Future's address with the Minnesota Secretary of State.

18.     Aimee Bock has a number of bank accounts, including an account at US Bank. As explained below, Aimee Bock deposited into this account a $310,000 kickback payment from a company that was misappropriating federal child nutrition program funds. **Subject Premises 2** is listed as the address on Aimee Bock's bank accounts.

19.     **Subject Premises 2** is also a mailing address used by Handy Helper's [sic] LLC, a company created by Aimee Bock's partner Empress Malcolm Watson Jr.

6

As explained below, the company was used to misappropriated approximately $600,000 in federal child nutrition program funds from Feeding Our Future.

20.    U.S. Postal Service records show that Aimee Bock, Empress Watson, and Handy Helper's LLC have all received mail at **Subject Premises 2** since December 2021.

**C.    Subject Premises 3**

21.    **Subject Premises 3** is office suite located at 1506 Southcross Drive West, Burnsville, Minnesota 55306. **Subject Premises 3** is a site location at which Feeding Our Future purports to serve meals as part of the federal child nutrition program.

22.    Minnesota Department of Education records show that Feeding Our Future submitted applications and reimbursement claims stating that the company was serving meals at **Subject Premises 3**.

| Sponsoring Authority Information: | | |
|---|---|---|
| Sponsor | 2000010264 - Feeding Our Future | |
| **Site Information:** | | |
| Site | 9000018726 - Southcross | |
| Site Application Status | ● Approve  ○ Deactivate | Deactivation Date _____ (mm/dd/yyyy) |
| Approval effective date range | Oct 2021 - Sep 2022 | |
| Site Address | 1506 Southcross Dr W, Burnsville, MN 55306; Dakota County | |
| Site Program Name | Southcross | |
| Program Year | 2021-2022   Stop Payment ☐ | |
| **Contact Information:** | | |
| Contact First Name | Aimee | Contact Last Name   Bock |
| Contact Title | Founder/Executive Director | Phone Number   6123454922   - Ext |

23.     Minnesota Department of Education records show that Feeding Our Future claimed to be serving tens of thousands a meals a month to children at **Subject Premises 3**. For example, Feeding Our Future claimed to have served more than 50,000 meals at **Subject Premises 3** in November 2021.

24.     An FBI agent conducted surveillance at **Subject Premises 3** on several occasions in December 20201. There were signs posted on windows near the entrance indicating that Feeding Our Future was offering free meals.

**D.     Subject Premises 4**

25.     **Subject Premises 4** is the office suite located at 3249 Hennepin Avenue South, Unit 75, Minneapolis, Minnesota 55408. Subject Premises 4 is the office of Abdikerm Abdelahi Eidleh and various entities controlled by Abdikerm Abdelahi Eidleh. As explained below, these entities have been used to fraudulently misappropriate federal child nutrition program funds and to solicit and receive kickbacks from entities participating in the federal child nutrition program.

26.     Minnesota Secretary of State records show that Abdikerm Abdelahi Eidleh controls several companies that are registered at **Subject Premises 4**, including Hope Suppliers LLC, Bridge Logistics LLC, Eidleh Inc., and Charm Home Care LLC.

27.     As explained below, Abdikerm Abdelahi Eidleh opened more than 20 bank accounts in the name of his various corporate entities. **Subject Premises 4** is listed as the address on most or all of the accounts.

28.     U.S. Postal Service records show that Abdikerm Abdelahi Eidleh, Hope Suppliers LLC, Bridge Logistics LLC, and Charm Home Care LLC have all received mail at **Subject Premises 4** in December 2021 or January 2022.

29.     The building directory at 3249 Hennepin Avenue South indicates that Eidleh Inc. and Charm Home Care LLC are both located in Unit 75.

**E.     Subject Premises 5**

30.     **Subject Premises 5** is the single-family home located at 15101 County Road 5, Burnsville, Minnesota 55306. **Subject Premises 5** is the residence of Abdikerm Abdelahi Eidleh, an employee of Feeding Our Future.

31.     Dakota County property records shows that Abdikerm Abdelahi Eidleh owns **Subject Premises 5**. U.S. Postal Service records show that Abdikerm Abdelahi Eidleh currently receives mail at **Subject Premises 5**.

32.     As explained below, Abdikerm Abdelahi Eidleh misappropriated federal funds from Feeding Our Future and also solicited and received kickbacks from sites participating in the federal child nutrition program. Abdikerm Abdelahi Eidleh then used this money to pay personal expenses. Abdikerm Abdelahi Eidleh opened more than 30 bank accounts in the name of his various corporate entities and then used the accounts to receive and launder the proceeds of his scheme. **Subject Premises 5** is listed as the address on many of these accounts, including accounts held in the name of Eidleh Inc. and Bridge Logistics LLC.

33.     In or about November 2020, Abdikerm Abdelahi Eidleh took out a loan for approximately $294,000 for use in purchasing **Subject Premises 5**. Bank records show that Abdikerm Abdelahi Eidleh later used approximately $212,000 in

fraudulently misappropriated federal child nutrition program to make payments on that loan. The loan documents all list **Subject Premises 5** as Abdikerm Abdelahi Eidleh's address.

**F.**     **Subject Premises 6**

34.     **Subject Premises 6** is a building located at 2854 Columbus Avenue South, Minneapolis, Minnesota 55407. **Subject Premises 6** is the location of another site at which Feeding Our Future claimed to be serving federally funded meals to children. Feeding Our Future referred to this site as "Feeding Our Future Taylor" (the "Taylor Site").

35.     Minnesota Department of Education records show that Feeding Our Future submitted an application for the Taylor Site's participation in the Federal Child Nutrition Program in or about January or February 2021. The application stated that the Taylor Site was located at **Subject Premises 6**.

36.     The application indicated that Feeding Our Future would be serving approximately 2,000 children a day. Aimee Bock was listed as the contact person for Feeding Our Future. The contract stated that a company called Metro Area Catering would be the vendor providing the meals for the Taylor Site.

37.     On or about January 4, 2022, an IRS agent conducted surveillance at **Subject Premises 6**. The IRS agent observed a sign indicating that I-Care Home Health Care was located at **Subject Premises 6**. According to Minnesota Secretary of State records, I-Care Home Health Care LLC is a Minnesota limited liability company located at **Subject Premises 6**. Mohamoud Warsame is identified as the manager and registered agent for I-Care Home Health Care LLC.

38.     As described below, Mahamoud Warsame also controls Metro Area Catering, the vendor company that purported to be providing the meals to be served at the Taylor Site/**Subject Premises 6**.

## III.   BACKGROUND

### A.   The Federal Child Nutrition Programs

39.     This warrant relates to an ongoing investigation into a scheme to defraud United States Department of Agriculture (USDA) programs that provide federal funding to nutrition programs for children and low-income individuals across the nation. The USDA operates two such programs—the Summer Food Service Program and the Child and Adult Care Food Program.

40.     The Summer Food Service Program (SFSP) is a federal program designed to ensure that low-income children continue to receive nutritious meals when school is not in session.

41.     The Child and Adult Care Food Program (CACFP) is a federal program that provides reimbursements for nutritious meals and snacks to eligible children and adults who are enrolled for care at participating child care centers, day care homes, and adult day care centers. CACFP also provides reimbursements for meals served to children participating in afterschool care programs or residing in emergency shelters and adults over the age of 60 or living with a disability and enrolled in day care facilities.

42.     The Summer Food Service Program and Child and Adult Care Food Program (together, the "Federal Child Nutrition Programs") operate throughout the United States. The USDA's Food and Nutrition Service administers the programs at

the national and regional levels by disbursing federal funds to state governments, which provide oversight over the Federal Child Nutrition Programs.

43.     Within each state, the Federal Child Nutrition Programs are administered by the state department of education or an alternate state-designated agency. In Minnesota, the programs are administered by the Minnesota Department of Education (MDE).

44.     Locally, meals funded by the Federal Child Nutrition Program are served at sites such as schools or daycare centers ("Sites"). Each Site must be sponsored by a public or private non-profit organization that is authorized to participate in the Federal Child Nutrition Programs ("Sponsors"). Sponsors seeking to participate in the Federal Child Nutrition Programs are required to submit an application to the MDE for approval for each site from which they intend to operate Federal Child Nutrition Programs. Sponsors are responsible for monitoring each of their sites and preparing reimbursement claims for their sites.

45.     Federal Child Nutrition Program funds are supposed to be used to provide nutritious meals and food to children and low-income individuals. *See* 7 C.F.R. § 225.15(a)(4) ("All Program reimbursement funds must be used solely for the conduct of the nonprofit food service operation.").

46.     Historically, the Federal Child Nutrition Program has generally functioned through the provision of meals to children involved in educational-based programs or activities. During the Covid-19 pandemic, however, the USDA waived some of the standard requirements for participation in the Federal Child Nutrition

Program. Among other things, USDA allowed for-profit restaurants to participate in the program. It also allowed for off-site food distribution to children outside of educational programs. At the same time, the state government's stay-at-home order and telework policies interfered with its ability to oversee the program. According to MDE officials, this left the program vulnerable to fraud and abuse.

**B.     Feeding Our Future**

47.     This warrant is an investigation into the widespread diversion and misuse of Federal Child Nutrition Program funds during the Covid-19 pandemic. Much of this fraud was committed by sites operated under the sponsorship of Feeding Our Future, a non-profit organization purportedly in the business of helping community partners participate in the Federal Child Nutrition Program and related federal programs. Feeding Our Future sponsors and helps administer sites that participate in the Federal Child Nutrition Program. According to its website, Feeding Our Future "utilize[s] the Child and Adult Care Food Program to increase healthy food access for Minnesota's youth and seniors." The website lists Aimee Bock as the founder and executive director of Feeding Our Future.

48.     Records obtained from MDE show that after being formed in 2017, Feeding Our Future quickly began receiving and distributing millions of dollars in Federal Child Nutrition Program Funds. The company went from receiving $3.4 million in 2019 to more than $197 million in 2021.

| Year | Approximate amount of Federal Child Nutrition Program funds to Feeding Our Future |
|------|-----------------------------------------------------------------------------------|
| 2018 | $307,253 |
| 2019 | $3,487,168 |
| 2020 | $42,681,790 |
| 2021 | $197,932,695 |
| Total | $244,408,906 |

49. Feeding Our Future entered into contracts with the sites it sponsored. Under these contracts, Feeding Our Future deducted 10 percent of all Federal Child Nutrition Program reimbursements received by the sites under its sponsorship as its "administrative fee."

> 14. Receive payments of CACFP reimbursements from FEEDING OUR FUTURE, after deduction of administrative fee of **10 percent**, within five working days of FEEDING OUR FUTURE's receipt of program reimbursement funds from MDE.

50. This provided an incentive for Feeding Our Future, and its Executive Director Aimee Bock, to increase the number of sites under its sponsorship as well as the amount of Federal Child Nutrition Program reimbursements each site was receiving.

51. MDE became concerned about the massive increase in Federal Child Nutrition Program funds going to sites sponsored by Feeding Our Future as well as the large increase in the number of sites under Feeding Our Future sponsorship. According to MDE employees, MDE began more carefully scrutinizing new site applications submitted by Feeding Our Future. Feeding Our Future later sued MDE, alleging that it unlawfully denied its site applications and withheld reimbursements

14

to which Feeding Our Future and sites under its sponsorship were entitled. This lawsuit is currently pending in Ramsey County District Court.

52.    At various times during this litigation, the presiding judge has concluded that MDE wrongfully withheld funds and violated federal regulations in its attempts to oversee Feeding Our Future and sites under its sponsorship.

53.    In April 2021, MDE provided information to the FBI alleging that Feeding Our Future and sites under its sponsorship were diverting funds away from the nutrition program. MDE believed certain sites were submitting fraudulent documents to support reimbursement of funds in addition to artificially inflating the number of children and low-income individuals receiving benefits in order to obtain funds. But MDE did not have access to the participating companies' bank records so was unable to conclusively determine whether they were misappropriating Federal Child Nutrition Program funds.

54.    In May 2021, the FBI began investigating the allegations surrounding the misuse of federal funds intended for feeding children and low-income individuals. As part of this investigation, the FBI obtained records of hundreds of bank accounts that received, either directly or indirectly, Federal Child Nutrition Program funds. A review of these financial records showed a massive fraud scheme involving the misuse and theft of tens of millions of dollars in Federal Child Nutrition Program funds.

**C.    Feeding    Our    Future-Sponsored    Sites    Fraudulently Misappropriated Millions of Dollars in Federal Child Nutrition Program Funds**

55.    Safari Restaurant and Event Center is one of the sites receiving Federal Child Nutrition Program money under the sponsorship of Feeding Our Future. A

group of individuals who own or are associated with Safari Restaurant have participated in a fraudulent scheme to obtain and misappropriate millions of dollars in Federal Child Nutrition Program funds. Beginning in 2020, these individuals have created several companies for use in carrying out these schemes. They enrolled their companies in the Federal Child Nutrition Program under the sponsorship of Feeding Our Future. They then claimed to be feeding meals to thousands of children a day, for which they were reimbursed more than $10 million. But bank records show they misappropriated most of this money and used it to purchases real estate, cars, and other luxury items.

56.     Safari Restaurant applied to participate in the Federal Child Nutrition Program under the sponsorship of Feeding Our Future in April 2020. Salim Said signed the application on behalf of Safari Restaurant and Aimee Bock signed on behalf of Feeding Our Future.

57.     On or about April 24, 2020, MDE informed Bock that it was denying the application. In an email to Bock, an MDE employee explained that "[b]ased on guidance from USDA, we aren't creating any new CACFP At-Risk site IDs for locations not currently providing care."

58.     Bock and Feeding Our Future objected to the denial of the application. On or about April 24, 2020, Bock claimed that "[t]hese sites are already providing meals to the states youth with the expectation of the meals being reimbursed" and asked what "authority . . . allows you to deny site applications to sites that are clearly eligible."

59.     Bock and Feeding Our Future subsequently submitted a formal complaint to MDE about the denial of Safari Restaurant's application. In an email sent on April 28, 2020, an attorney representing Feeding Our Future told MDE he was going to be filing a formal complaint about the denial of the application. He explained that the sites, including Safari Restaurant, were "all minority owned businesses serving almost exclusively economically disadvantaged children of color." In an apparent reference to the Covid-19 pandemic, he cited "the extraordinary times we are in now" and said it was "critical that we get a speedy decision from MDE on this" because "[t]hese children, families, and businesses desperately need the federal help they are entitled to."

60.     Later that day, Bock sent a follow-up email to an MDE employee. Bock said she "was extremely disappointed that MDE would deny these sites the opportunity to feed youth culturally relevant foods during this national emergency. It was even more shocking considering the great work these sites do."

61.     Two days later, on or about April 30, 2020, MDE approved Safari Restaurant's application and authorized its participation in the Federal Child Nutrition Program.

**D.     Safari Restaurant Almost Immediately Claimed it was Entitled to Hundreds of Thousands of Dollars in Federal Child Nutrition Program Funds**

62.     By July 2020, Safari Restaurant claimed that it was serving or providing meals to 5,000 children a day. That month, MDE conducted an administrative review and audit of Safari Restaurant's participation in the Summer Food Service Program

(SFSP). As part of that review, MDE requested meal count records showing the number of meals served at the site each day.

63.     In response to MDE's request, Feeding Our Future submitted weekly count forms purporting to show that Safari Restaurant provided both breakfast and lunch for 5,000 children a day, seven days a week, in July 2020. Safari Restaurant claimed that it served both breakfast and lunch to between 4,985 and 4,998 children each day of July 2020.

## FEEDING OUR FUTURE
### SUMMER MEAL COUNTS – CLICKER

| Sponsor | FEEDING OUR FUTURE | Email | aimee@feedingourfuturemn.org | | Phone | 612.345.4922 | |
| Site | SAFARI RESTAURANT | Supervisor | | | Week of | 7/5/20 | |
| Meal Type | | Breakfast X | Lunch | | Snack | | Supper |

| Available Meals | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Number of meals received/prepared | 5000 | 5000 | 5000 | 5000 | 5000 | 5000 | 5000 | |
| Number of meals from yesterday | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

| Meal Counts | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Number of firsts served to children | 4996 | 4996 | 4991 | 4994 | 4990 | 4998 | 4989 | |
| Number of second meals served to children (not reimbursable) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Number of meals served to program adults (not reimbursable) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Number of meals served to non-program adults (not reimbursable) | 2 | 1 | 5 | 3 | 7 | 0 | 4 | |
| Number of children requesting meals of food is gone | 35 | 40 | 43 | 46 | 52 | 65 | 57 | |

| Food | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
|---|---|---|---|---|---|---|---|---|
| FOOD TEMPERATURE | 140F | 140F | 140F | 140F | 140F | 140F | 140F | |
| Number of non-reimbursable, incomplete or damaged meals | 2 | 3 | 4 | 3 | 3 | 2 | 7 | |
| Number of leftover meals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Initials of person taking daily meal count certifying that the information is true and accurate | SS | SS | SS | SS | SS | SS | SS | |

SITE SUPERVISOR: By signing, I certify that the above information is true and accurate.

| Signature | [signature] | Date | 7/11/20 |

64.     This is an exceedingly large number of children. By way of comparison, the largest high school in the state of Minnesota—Wayzata High School—has an enrollment of approximately 3,600 students.

65.     Bank records show that Safari Restaurant received approximately $476,000 in Federal Child Nutrition Program funds in July 2020. The company

received approximately $702,000 in Federal Child Nutrition Program funds in August 2020.

**E.    Individuals Involved in Safari Restaurant Applied to Open Additional Sites in Fall 2020 Under the Sponsorship of Feeding Our Future**

66.    In the fall of 2020, individuals associated with Safari Restaurant enrolled additional sites in the Federal Child Nutrition Program under the sponsorship of Feeding Our Future. These sites were run by new companies created for use in participating in the Federal Child Nutrition Program, including ASA Limited LLC and Olive Management Inc. These sites quickly began reporting that they were serving meals to large numbers of children on a daily basis.

**1.    ASA Limited LLC**

67.    According to Minnesota Secretary of State records, Abdihakim Ali Ahmed created ASA Limited LLC on or about September 4, 2020. That same day, ASA Limited LLC completed an application to enroll in the Federal Child Nutrition Program under the sponsorship of Feeding Our Future. The application and accompanying "New Site Intake" form stated that ASA Limited LLC would be serving both breakfast and lunch to 3,000 children on Saturday and Sundays. Abdihakim Ahmed signed the application on behalf of ASA Limited LLC. Aimee Bock signed the application on behalf of Feeding Our Future. In correspondence with MDE, Bock explained that ASA Limited would be "serving youth living in St. Paul" and "in an area that does not have other culturally appropriate food sites."

68.    ASA Limited immediately began claiming that it was entitled to large amounts of Federal Child Nutrition Program funds. For example, ASA Limited

claimed that it was entitled to more than $700,000 in Federal Child Nutrition Program funds for meals served in September and October 2020.

69.     In all, MDE records show that ASA Limited has received more than $5.3 million in Federal Child Nutrition Program funds since its creation in September 2020.

### 2.     Olive Management

70.     Minnesota Secretary of State records show that Olive Management was created by Ahmed Omar-Hashim in September 2020. That same month, the company submitted an application to participate in the Federal Child Nutrition Program under the sponsorship of Feeding Our Future. The application stated that Olive Management would be serving both breakfast and lunch, totaling 2,500 meals a day. Ahmed Omar-Hashim signed the application on behalf of Olive Management and Aimee Bock signed on behalf of Feeding Our Future. The application included an agreement between Feeding Our Future and Olive Management authorizing Feeding Our Future to charge administration fees "not to exceed 10 percent" of the Federal Child Nutrition Program reimbursements received by Olive Management.

71.     Olive Management immediately began claiming that it was entitled to large amounts of Federal Child Nutrition Program funds. For example, the company claimed that it was entitled to more than $1.2 million in Federal Child Nutrition Program funds for meals served from September to November 2020.

72.     In all, MDE records show that Olive Management has received more than $5.2 million in Federal Child Nutrition Program funds since its creation in September 2020.

**F.   Feeding Our Future Filed a Lawsuit After MDE Terminated Safari Restaurant from the Federal Child Nutrition Program**

73.   In the fall of 2020, MDE raised concerns about the number of new sites being sponsored by Feeding Our Future. MDE also questioned the size of the reimbursements being claimed by these sites. For example, in a September 2020 letter to Feeding Our Future, an MDE employee noted that Safari Restaurant "is projected to serve a comparable number of meals" to "the entire St. Paul Public School District." MDE asked Feeding Our Future to "[p]lease explain how Safari Restaurant has this capacity to serve this number of meals, the need for these meals, and how the site is promoted."

74.   In October 2020, MDE terminated Safari Restaurant's participation in the Federal Child Nutrition Program effective October 31, 2020. During this same time frame, MDE utilized a multi-step review process for approving new sites to ensure that Federal Child Nutrition Program funds were being used properly.

75.   In November 2020, Feeding Our Future sued MDE for failing to process its site applications. In the complaint, Feeding Our Future claimed that MDE was unlawfully refusing to approve their site applications and unlawfully withholding payments of Federal Child Nutrition Programs funds to sites under Feeding Our Future's sponsorship. Feeding Our Future alleged that, as a result, "[t]housands of qualified children in low-income and minority communities are going without desperately needed federal food programs because MDE refuses to process Feeding Our Future's applications." Feeding Our Future further alleged that MDE had violated the Minnesota Human Rights Act by "discriminating" against Feeding Our

Future due to its "cater[ing] to members of a protected class of racial minorities and foreign nationals."

76. As this litigation has proceeded, Safari Restaurant and related entities have continued to receive millions of dollars from the Federal Child Nutrition Program. As explained below, a review of bank records shows that this money was not used to feed children. Instead, the bulk of the money was stolen and used to, among other things, purchase expensive cars and real estate.

### G. Feeding Our Future and Safari Restaurant Provided Fake Documentation to MDE

77. In January 2021, MDE conducted an audit of Feeding Our Future. This audit was triggered, in part, by suspicions about the large amount of Federal Child Nutrition Program money being received by Feeding Our Future and sites under its sponsorship. In responding to that audit, Feeding Our Future provided claim detail reports and summer meal counts that purport to document the meals served by Safari Restaurant in March 2021.

78. Feeding Our Future also submitted weekly meal count forms for certain days in March 2021 as part of its response to MDE's audit. These weekly meal count forms stated that Safari Restaurant prepared both breakfast and lunch for 6,000 children a day, seven days a week, in March 2021. The meal count forms indicate that for each of these days, Safari Restaurant actually served between 5,991 and 5,999 children.

## FEEDING OUR FUTURE

### SUMMER MEAL COUNTS — CLICKER

| Sponsor | FEEDING OUR FUTURE | Email | aimee@feedingourfuturemn.org | | Phone | 612.345.4922 | |
|---|---|---|---|---|---|---|---|
| Site | SAFARI RESTAURANT | Supervisor | | | Week of | 03/01/21 | |

| Meal Type | ✓ BREAKFAST | | | | LUNCH | | | |
|---|---|---|---|---|---|---|---|---|
| **Available Meals** | | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
| Number of meals received/prepared | | 7 | 6000 | 6000 | 6000 | 6000 | 6000 | 6000 | |
| Number of meals from yesterday | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| **Meal Counts** | | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
| Number of firsts served to children | | | 5998 | 5997 | 5996 | 5998 | 5999 | 5999 | |
| Number of second meals served to children (not reimbursed) | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Number of meals served to program adults (not reimbursed) | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Number of meals served to non-program adults (not reimbursed) | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Number of children requesting meals if food is gone | | | 71 | 76 | 79 | 81 | 77 | 75 | |
| **Food** | | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
| FOOD TEMPERATURE | | | NA | NA | NA | NA | NA | NA | |
| Number of non-reimbursable, incomplete or damaged meals | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Number of leftover meals | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Initials of person taking daily meal count certifying that the information is true and accurate | | \ | SS | AS | AS | AS | AS | O,A | |

SITE SUPERVISOR: By signing, I certify that the above information is true and accurate.

| Signature | | Date | 03/06/21 |
|---|---|---|---|

79.    According to Feeding Our Future's audit response, Safari Restaurant served meals to children all 31 days of March 2021. In all, the response stated that Safari Restaurant served 185,903 children in March 2021. Safari Restaurant received approximately $1,143,303 in Federal Child Nutrition Program funds based on these claims for March 2021 alone. Feeding Our Future received an additional $95,740 on top of this amount for administering Safari Restaurant's participation in the Federal Child Nutrition Program in March 2021.

80.    By way of comparison, the average McDonalds franchise has approximately $2.9 million in annual revenue, according to QSR, a trade magazine for the quick-service and fast-casual restaurant industry.[1]

---

[1]    See https://www.qsrmagazine.com/content/these-29-fast-food-brands-earn-most-restaurant (last accessed Nov. 2, 2021).

81.     Feeding Our Future and Safari Restaurant also appear to have submitted false invoices purporting to support their reimbursement claims. For example, on or about August 3, 2021, an accountant sent an email to Bock with the subject line "INVOICES." Attached to the email was a PDF document titled "INVOICES FOR SAFARI SITES.pdf." The document consisted of five separate invoices to Feeding Our Future from Safari Restaurant and sites run by the Safari Restaurant group—Stigma Free Mankato, Stigma Free Willmar, Brava Restaurant, Olive Management, and ASA Limited. Each of the invoices was dated July 31, 2021. And each of the invoices was identical. The invoices charged for the serving of 2,000 meals per day for all 31 days of July 2021. They billed Feeding Our Future at a rate of $7.11 per meal. This resulted in charges of $14,220 a day and $440,820 for the month for each of the five sites.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| On 07/28/2021 served BREAKFAST & LUNCH | 2000 | $ | 7.11 | $ | 14,220.00 | On 07/28/2021 served BREAKFAST & LUNCH | 2000 | $ | 7.11 | $ | 14,220.00 |
| On 07/29/2021 served BREAKFAST & LUNCH | 2000 | $ | 7.11 | $ | 14,220.00 | On 07/29/2021 served BREAKFAST & LUNCH | 2000 | $ | 7.11 | $ | 14,220.00 |
| On 07/30/2021 served BREAKFAST & LUNCH | 2000 | $ | 7.11 | $ | 14,220.00 | On 07/30/2021 served BREAKFAST & LUNCH | 2000 | $ | 7.11 | $ | 14,220.00 |
| On 07/31/2021 served BREAKFAST & LUNCH | 2000 | $ | 7.11 | $ | 14,220.00 | On 07/31/2021 served BREAKFAST & LUNCH | 2000 | $ | 7.11 | $ | 14,220.00 |

SUBTOTAL $ 440,820.00 — TAX RATE — SALES TAX $ - — OTHER — TOTAL $ 440,820.00

I THANK YOU FOR YOUR BUSINESS!

82. In total, the five invoices sent on August 3, 2021, billed $2,204,100 to Feeding Our Future, which was responsible for distributing Federal Child Nutrition Program funds to these sites. This $2.2 million was for the one month of July 2021.

## IV. SAFARI RESTAURANT AND RELATED ENTITIES MISAPPROPRIATED $15 MILLION IN FEDERAL CHILD NUTRITION PROGRAM FUNDS

83. Bank records show that more than $15 million in Federal Child Nutrition Program funds were deposited into bank accounts held by Cosmopolitan Business Solutions dba Safari Restaurant between May 2020 and November 2021.

84. A review of these accounts shows that little of this money was used to buy food or other items related to participation in the Federal Child Nutrition Program. Instead, the most significant withdrawals from the Safari Restaurant accounts were transfers to limited liability companies controlled by owners or associates of Safari Restaurant. This money was then used to purchase real estate, cars, and other luxury items.

85. For example, bank records show that approximately $7.9 million was deposited into an account at Bridgewater Bank between October 2020 and July 2021. More than $6.9 million of this amount represented Federal Child Nutrition Program funds from Feeding Our Future (most of the remaining $1 million was transferred

from related corporate entities). The account did not show any significant deposits from the operation of the restaurant or event center.

86.    Bank records show that almost none of the Federal Child Nutrition Program funds deposited into this account were used to purchase food to prepare and feed to children. Instead, the majority of the money deposited into the account was transferred to limited liability companies owned or controlled by owners of Safari Restaurant. In all, bank records show that approximately $5.3 million was transferred to LLCs controlled by owners or associates of Safari Restaurant.

| Entity Bank Account(s) | Entity owner/account holder | Amount Transferred (approximate) |
|---|---|---|
| 3017 LLC | Abdulkadir Nur Salah | $1.9 million |
| Salim Limited LLC | Salim Said | $1.4 million |
| Afra Grill LLC | Abdirahman Ahmed Sagal Aden | $1.35 million |
| AG Limited LLC | Ahmed Ghedi | $694,000 |
| | Total | $5.3 million |

87.    Safari Restaurant also has accounts at Bell Bank. Abdulkadir Nur Salah is the signatory on the accounts. Approximately $6.5 million was deposited into the account between approximately July 15 and November 30, 2021. More than $6.2 million (or 92 percent) were Federal Child Nutrition Program funds received from Feeding Our Future.

88.    Again, bank records show that almost none of this money was used to purchase food. Instead, a large portion of this money was transferred to limited liability companies owned or controlled by owners of associates of Safari Restaurant.

In all, bank records show that approximately $1.1 million was transferred to companies owned or controlled by the owners of Safari Restaurant.

| Entity | Entity owner/account holder | Amount Transferred (approximate) |
|---|---|---|
| ASA Limited LLC | Abdihakim Ahmed Salim Said Ahmed Ghedi | $859,000 |
| 3017 LLC | Abdulkadir Nur Salah | $138,000 |
| Salim Limited LLC | Salim Said | $35,000 |
| 1130 Holdings Inc. | Abdihakim Ahmed | $82,000 |
| | Total | $1,114,000 |

89.    Another $1,909,100 was transferred to bank accounts held by two other entities—Tunyar Trading LLC and Horseed Management LLC.

| Entity | Entity owner/account holder | Amount Received from Safari Restaurant (approximate) |
|---|---|---|
| Tunyar Trading LLC | Abdikadir Mohamud | $956,400 |
| Horseed Management LLC | Abdinasir Abshir | $952,700 |
| | Total | $1,909,100 |

90.    Both Tunyar Trading LLC and Horseed Management LLC were set up in September-October 2020. According to Minnesota Secretary of State records, Tunyar Trading LLC was formed on or about September 28, 2020, and Horseed Management LLC was formed on October 9, 2020. Both Tunyar Trading and Horseed Management had vendor contracts to provide food or meals to sites sponsored by Feeding Our Future. According to these contracts, Feeding Our Future would pay the companies $2.13 per breakfast and $3.67 per lunch.

91.     Both companies opened bank accounts into which millions of dollars in fraudulently obtained Federal Child Nutrition Program funds flowed. But bank records show that these companies did not use these funds to buy food or prepare meals. Instead, the companies appear to function essentially as shell companies designed to help launder misappropriated and fraudulently obtained Federal Child Nutrition Program funds.

92.     Tunyar Trading had accounts at US Bank, JP Morgan Chase, and TruStone Financial Credit Union. More than $4 million was deposited into these accounts in 2021. Almost all of this money came from Safari Restaurant or other entities whose owners appear to be fraudulently obtaining Federal Child Nutrition Program funds, including Safari Restaurant and Stigma-Free International Inc.

| Entity | Owner | Amount Transferred to Tunyar Trading LLC in 2021 (approximate) |
|---|---|---|
| Stigma-Free International Inc. | Ahmed Artan | $3,154,216 |
| Cosmopolitan Business Solutions dba Safari Restaurant | Salim Said Ahmed Ghedi Abdihakim Ahmed Abdulkadir Nur Salah | $594,859 |
| Salim Limited LLC | Salim Said | $65,000 |
| Horseed Management LLC | Abdinasir Abshir | $56,701 |
| AG Limited LLC | Ahmed Ghedi | $30,000 |
| | Total | $3,900,776 |

93.     Stigma-Free International Inc. is another company that appears to be fraudulently receiving Federal Child Nutrition Program funds under the sponsorship of Feeding Our Future. Records obtained from U.S. Bank and Bank of America show that Stigma-Free International Inc. received more than $6.5 million from Feeding

Our Future since January 2021. Bank records show that none of this money was used to purchase food or meals for underprivileged children. Instead, the bulk of the money was transferred to entities controlled by individuals associated with Safari Restaurant.

94.    Although bank records show that Stigma-Free did not use the Federal Child Nutrition Program funds to purchase food or prepare meals, the company claimed to be serving meals to thousands of children a day. For example, in September 2021, the owner of Stigma Free, Abdikadir Mohamud, sent an email to Aimee Bock with the subject line "Willmar Meal Count/Invoice for September." Attached to the email were "Summer Meal Counts" claiming that Stigma Free served 2,000 meals a day, seven days a week during August 2021 in Willmar, Minnesota.

**FEEDING OUR FUTURE**

## SUMMER MEAL COUNTS — CLICKER

| Sponsor | FEEDING OUR FUTURE | Email | aimee@feedingourfuturemn.org | Phone | 612.345.4922 |
|---|---|---|---|---|---|
| Site | STIGMA FREE WILLMAR | Supervisor | Abdikadir Mohamud | Week of | 08/15/2021 |

| Meal Type ✓ BREAKFAST | | | | LUNCH | | | | |
|---|---|---|---|---|---|---|---|---|
| Available Meals | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
| Number of meals received/prepared | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 14000 |
| Number of meals from yesterday | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Meal Counts | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
| Number of firsts served to children | 1989 | 1995 | 1993 | 1997 | 1998 | 1999 | 1997 | 13978 |
| Number of second meals served to children (not reimbursed) | 6 | 6 | 0 | 0 | 6 | 0 | 0 | 0 |
| Number of meals served to program adults (not reimbursed) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Number of meals served to non-program adults (not reimbursed) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Number of children requesting meals if food is gone | 17 | 12 | 10 | 7 | 9 | 17 | 13 | |
| Food | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
| FOOD TEMPERATURE | NA | NA | NA | NA | NA | NA | NA | |
| Number of non-reimbursable, incomplete or damaged meals | 0 | 6 | 0 | 0 | 6 | 0 | 0 | 6 |
| Number of leftover meals | 0 | 6 | 0 | 0 | 6 | 0 | 0 | 6 |
| Initials of person taking daily meal count certifying that the information is true and accurate | Aw | Aw | Aw | Aw | Aw | Aw | Aw | |

SITE SUPERVISOR: By signing, I certify that the above information is true and accurate.

| Signature | A. Mohamud | Date | 08/21/2021 |
|---|---|---|---|

95. According to the latest census data, only 21,000 people live in Willmar.

96. Bank records show that little of the money deposited into the Tunyar Trading LLC accounts was used to purchase food or meals to serve to underprivileged children. Instead, the bulk of the money was transferred to other limited liability companies and entities, including entities controlled by owners of associates of Safari Restaurant.

97. Similarly, records of the accounts held by Horseed Management LLC show that those accounts also appear to have served as pass through accounts through which money was transferred to and from entities involved in fraudulently obtaining Federal Child Nutrition Program funds.

98.     At first glance, this money appears as though it could have been used to purchase food or meals to serve to children as part of the Federal Child Nutrition Program. But a review of these accounts show that was not the case. Instead, this money passed through these accounts and was quickly transferred to accounts held by owners of associates of Safari Restaurant. These accounts appear to be in the name of shell companies used to launder misappropriated and fraudulently obtained Federal Child Nutrition Program funds.

99.     Safari Restaurant also had accounts at Associated Bank. In total, approximately $3.3 million was deposited into the account between May 15 and October 29, 2020. Of this, approximately $2.6 million was Federal Child Nutrition Program funds received from Feeding Our Future (the bulk of the remaining money came from an intercompany transfer for $637,000). The account showed no significant revenue from the operation of Safari Restaurant outside of the Federal Child Nutrition Program.

100.    Again, a review of the company's bank records shows that little of this money was used to purchase food to serve to underprivileged children. Instead, more than $1.5 million was transferred to owners of Safari Restaurant directly or via entities they controlled.[2]

| Entity | Entity owner/account holder | Amount Transferred (approximate) |
|---|---|---|
| 3017 LLC | Abdulkadir Nur Salah | $562,000 |
| Salim Limited LLC | Salim Said | $520,000 |

[2]     Some of this money was first transferred to a second Safari Restaurant account at Associated Bank before being ultimate distributed to the Safari Restaurant owners or associates, or their entities.

| | | |
|---|---|---|
| Abdirahman Ahmed | N/A | $304,000 |
| Afra Grill LLC | Abdirahman Ahmed Sagal Aden | $220,000 |
| | **Total** | **$1,606,000** |

101.  During the investigation, the government subpoenaed records related to the accounts into which these funds were deposited. They, too, show that little of the money was used to buy food. Instead, bank records show that the owners of Safari Restaurant transferred most of the money to and from numerous bank accounts held in the name of an array of entities they controlled. Based on my training and experience, and conversations with FBI forensic accountants, this activity appears to have been designed to launder the money fraudulently obtained from the Federal Child Nutrition Program. The banks appear have taken the same view, as several of these accounts were closed by the banks for violating anti-money laundering policies.

102.  Along the way, the owners of Safari Restaurant misappropriated the money and used much of it to purchase real estate, cars, and other luxury items.

103.  For example, approximately $1.9 million was transferred from the Safari Restaurant accounts to accounts held by Salim Limited, LLC, a limited liability company created by Salim Said in July 2020. Minnesota Secretary of State records list Safari Restaurant as the company's registered office address.

104.  Bank records show that Salim Said did not use this money to purchase food to serve to underprivileged children. Instead, he used it to fund his own lifestyle.

### A. Salim Said used Federal Child Nutrition Program funds to purchase a Pickup Truck for $87,000 in February 2021

105. Bank records show that Salim Said also used Federal Child Nutrition Program funds to purchase a 2021 Chevrolet Silverado 3500 pickup truck for $87,000.

106. On or about January 19, 2021, Feeding Our Future sent approximately $549,950 in Federal Child Nutrition Program funds to a Wells Fargo account in the name of Olive Management Inc.

107. Approximately three days later, on or about January 22, 2021, Ahmed Omar-Hashim, wrote a $70,000 check from the Olive Management Wells Fargo account to Salim Limited LLC, a company controlled by Salim Said.

108. This check was deposited into an account held by another Said-controlled company, Salim Limited LLC, at Bridgewater Bank. Salim Said was the signatory on the account.

109. On or about February 24, 2021, Said obtained a $47,000 cashier's check payable to Lupient Chevrolet from the Salim Limited LLC account at Bridgewater Bank. At the time, the account had a balance of approximately $1,045,310, all of which was derived from Federal Child Nutrition Program funds.



110.   Said used this check to purchase a 2021 Chevrolet Silverado 3500 pickup truck with the VIN number 1GC4YUEY4MF160143 and Minnesota license plate YNF8701. The sales contract lists Said as the buyer of the truck. The purchase price was approximately $87,201.

**B.    Salim Said used $950,000 in Federal Child Nutrition Program Funds to Purchase a House in Plymouth, Minnesota in July 2021**

111.   A review of bank records shows that in July 2021 one the Safari Restaurant owners, Salim Said, purchased the single-family home located at 5150 Alvarado Lane in Plymouth, Minnesota using more than $950,000 in Federal Child Nutrition Program funds.

112.   Bank records show that Said purchased the house using Federal Child Nutrition Program funds. These funds were originally received from Feeding Our Future and deposited into accounts held by three companies owned or controlled by Said or other associates of the Safari Restaurant group—Stigma Free International, ASA Limited LLC, and Cosmopolitan Business Solutions d/b/a Safari Restaurant. Ultimately, funds from these accounts went into Salim Limited LLC's account at Wells Fargo Bank.



113. These Federal Child Nutrition Program funds were to be used to provide healthy and nutritious meals to underprivileged children and adults. That did not happen.

114. Salim Said used the money deposited into the Salim Limited LLC account to purchase 5150 Alvarado Lane, where he and his wife now live. According

to an online realty website, 5150 Alvarado Lane is a 5-bedroom, 5-bathroom, 5,962-square foot house with an indoor basketball court.

**C.    Salim Said and Abdulkadir Nur Salah Used $2.8 Million in Federal Child Nutrition Program Funds to Purchase an Office Building in August 2021**

115.   A review of bank records show that the Salim A. Said, Abdulkadir Nur Salah, and Ahmed Omar-Hashim used $2.8 million in federal child nutrition program funds to purchase a commercial office building located at 2722 and 2742 Park Avenue South, Minneapolis, Minnesota (the "Park Avenue Property").

116.   The money used to purchase the Park Avenue Property was the proceeds of fraudulently received/misappropriated Federal Child Nutrition Program funds. These funds came from Feeding Our Future and were deposited into bank accounts held by several companies owned and controlled by owners or associates of Safari Restaurant:

| Entity (Bank Account) | Entity Owner/Account Holder | Amount Received into Account from Feeding Our Future (Approximate) | Date Range |
|---|---|---|---|
| Cosmopolitan Business Solutions d/b/a Safari Restaurant | Abdulkadir Nur Salah<br><br>Salim A. Said | $5,533,739 | 2/19/2021 to 5/14/2021 |
| ASA Limited LLC | Abdihakim A. Ahmed<br>Salim A. Said | $2,211,460 | 2/16/2021 to 5/20/2021 |
| Stigma Free International Inc. | Ahmed M. Artan | $779,666 | 1/15/2021 to 1/25/2021 |
| Olive Management Inc. | Ahmed S. Hashim | $1,124,435 | 5/20/2021 |

117.   This money was intended for use in providing nutritious meals to underprivileged children. But that did not happen. Instead, the owners of the entities then sent the Federal Child Nutrition Program funds through one or more bank accounts held in the name of entities they controlled. As explained above, these entities were nothing more than shell companies with bank accounts used to launder money and disguise the source of the funds.



118.   After being laundered through various other bank accounts, a total of $2,750,000 was deposited into an account in the name of Cosmopolitan Business

Properties LLC at Bridgewater Bank. All of this money was deposited into the account on July 2, 2021. The money was transferred from bank accounts held by four entities owned or controlled by owners or associates of Safari Restaurant.

| Entity | Entity Owner/Account Holder | Amount Deposited into the Cosmopolitan Business Properties LLC account | Date of Deposit |
|---|---|---|---|
| Salim Limited LLC | Salim Said | $890,000 | July 2, 2021 |
| 3017 LLC | Abdulkadir Nur Salah | $840,000 | July 2, 2021 |
| AG Limited LLC | Ahmed Ghedi | $560,000 | July 2, 2021 |
| Olive Management Inc. | Ahmed Omar-Hashim | $460,000 | July 2, 2021 |
| | Total | $2,750,000 | |

119. The Cosmopolitan Business Properties bank account was created and used solely for this transaction. On or about July 15, 2021, less than two weeks after these funds had been transferred into the account, Cosmopolitan Business Properties LLC used the money to purchase the Park Avenue Property for $2,780,000. 2722 Park Avenue is one of the large historic mansions on Park Avenue in south Minneapolis. The property has been converted into office space.



120.    Bank records show that $2,735,000 was transferred from the Cosmopolitan Business Properties LLC account at Bridgewater Bank to First American Title Insurance Company on July 15, 2021. The memo line indicated that the money was being used for the purchase of the Park Avenue Property. Title company records show that Cosmopolitan Business Properties LLC had previously made a $50,000 payment towards the purchase of the Park Avenue Property on June 24, 2021.

121.    Records obtained from First American Title Company show that the buyer of the Park Avenue Property was Cosmopolitan Business Properties LLC, an entity created in June 2021.

**D.    Aimee Bock Received a $310,000 Kickback from Safari Restaurant**

122.    The investigation revealed evidence that one of the owners of Safari Restaurant, Abdulkadir Nur Salah, appears to have paid a $310,000 kickback to Aimee Bock.

123.    Bank records show that Abdulkadir Nur Salah obtained a $310,000 cashier's check from a Safari Restaurant account on or about August 13, 2021. This check was made out to Aimee Bock. Bank records show that the $310,000 was derived directly from Federal Child Nutrition Program funds.



124.    Aimee Bock deposited this $310,000 check into a personal account held by her and ex-husband at US Bank on or about August 13, 2021. Bank records show that this money was used on personal expenses. Within the next five days, this account was used to make a $4,743 purchase at HOM Furniture and more than $1,400 in purchases at the outlet mall in Eagan, Minnesota.

125.    Bock also purchased two large cashier's check: (1) a $70,000 cashier's check made out to her ex-husband on or about August 28, 2021; and (2) a $15,095 cashier's check made out to Walser, a local car dealership, on or about October 1, 2021.

126.    As of October 18, 2021, the account had a balance of approximately $209,000. The bulk of this money was from the kickback payment from Safari Restaurant.

V.   FEEDING OUR FUTURE RAN ITS OWN FRAUDULENT SITES

127.   Feeding Our Future also had its own sites that participated in the Federal Child Nutrition Program. As explained below, the investigation has revealed that Feeding Our Future submitted fraudulent claims for reimbursements of Federal Child Nutrition Program funds for meals purportedly served at nonexistent sites.

A.   The Southcross Site

128.   Feeding Our Future operated a site located at 1506 Southcross Drive West in Burnsville, Minnesota 55306 (a/k/a **Subject Premises 3** or the "Southcross Site"). Feeding Our Future submitted a site application for the Southcross Site to MDE in 2020.

129.   Feeding Our Future reported to MDE that Empire Market and Cuisine would be the vendor providing food for the site. Feeding Our Future entered into a "Summer Food Service Program Contract for Vended Meals" with Empire Cuisine and Market. The contract provided that Empire Cuisine and Market would be reimbursed $2.34 for each breakfast provided and $4.01 for each lunch provided. Aimee Bock signed the contract on behalf of Feeding Our Future. Abdiaziz S. Farah signed on behalf of Empire Cuisine and Market.

130.   The investigation has revealed that Empire Cuisine and Market did not use the Federal Child Nutrition Program funds it received to purchase food or provide meals. Instead, Abdiaziz S. Farah and the other owners of Empire Cuisine and Market and related entities fraudulently misappropriated the reimbursements they received and used much of the money to purchase real estate and cars. For example,

on or about July 31, 2021, Abdiaziz S. Farah used $29,000 in Federal Child Nutrition Program funds received by Empire Cuisine & Market to buy a Porsche.



131. On January 11, 2021, Magistrate Judge Tony N. Leung signed four federal search warrants authorizing the search of Empire Cuisine and Market and related entities based on the companies' involvement in the fraudulent misappropriation of Federal Child Nutrition Program funds.

132. Feeding Our Future claimed to be serving tens of thousands of meals a month to children at the Southcross Site. For example, MDE records show that Feeding Our Future claimed to have served more than 50,000 meals at the Southcross Site in November 2021.

133. On or about November 24, 2021, at approximately 4:00 p.m., an FBI agent conducted surveillance at the Southcross Site. The agent saw no activity at the site.

134. The agent has since returned to the Southcross Site on several occasion in December 20201. There were signs posted on windows near the entrance indicating that Feeding Our Future was offering free meals. However, the agent saw no activity

or evidence that meals were actually being served at the Southcross Site. Each time the parking lot was empty.

135.    MDE records show that Feeding Our Future received more than $2 million in Federal Child Nutrition Program reimbursements in 2020 and 2021.

**B.     The Taylor Site**

136.    Feeding Our Future also operated a site located at 2854 Columbus Avenue South, Minneapolis, Minnesota 55407 (a/k/a **Subject Premises 6**). Feeding Our Future referred to this site as "Feeding Our Future Taylor" (hereinafter, the "Taylor Site").

137.    MDE records show that Feeding Our Future submitted an application for the Taylor Site's participation in the Federal Child Nutrition Program in or about January or February 2021. The application indicated that Feeding Our Future would be serving approximately 2,000 children a day. Aimee Bock was listed as the contact person for Feeding Our Future. The contract stated that a company called Metro Area Catering would be the vendor providing the meals for the Taylor Site.

138.    In or about October 2021, an MDE employee sent an email to Aimee Bock asking about the Taylor Site. The MDE employee noted that there appeared to be two sites located at 2854 Columbus Avenue—Feeding Our Future Taylor and another newly created site called "Southside Youth." The MDE employee asked Aimee Bock to "please double check." Aimee Bock responded to the email on or about October 4, 2021. Aimee Bock explained, "This is correct, we have verified that it is different youth being served at each of the locations in the building."

139. Southside Youth is another Federal Child Nutrition Program site under the sponsorship of Feeding Our Future. MDE records show that Southside Youth received approximately $501,598 in Federal Child Nutrition Program reimbursements for September and October 2021. According to MDE records, Feeding Our Future claimed that Southside Youth served more than 50,000 meals in October 2021.

140. The location at which Aimee Bock claimed these two Feeding Our Future-sponsored sites were serving meals—2854 Columbus Avenue South—is a small, one-story building in south Minneapolis.



141. In November and December 2021, the FBI had a surveillance camera outside of the 2854 Columbus Avenue South. A review of the video showed minimal activity at the building. There was nothing suggesting that food was being prepared, served, or delivered at the site. For example, there were no deliveries of food or lines of children entering or leaving the building.

142.  MDE record show that Feeding Our Future claimed to have served or provided after-school snacks and suppers to 59,541 children at 2854 Columbus Avenue South in November 2021. Feeding Our Future reported that it served meals all 31 days of November to an average of 1,921 children a day.



143.  Based on these reported totals, Feeding Our Future received approximately $292,941 in Federal Child Nutrition Program reimbursements for meals purportedly served at 2854 Columbus Avenue South in November 2021.



144. On or about January 4, 2022, an IRS agent conducted surveillance at 2854 Columbus Avenue South. The IRS agent observed a sign indicating that I-Care Home Health Care was located at 2854 Columbus Avenue South.



145. According to Minnesota Secretary of State records, I-Care Home Health Care LLC is a Minnesota limited liability company located at 2854 Columbus Avenue South. Mohamoud Warsame is identified as the manager and registered agent for I-Care Home Health Care LLC.

46

146.   A review of Aimee Bock's email shows that Mahamoud Warsame is involved in both Southside Youth and the Taylor Site. In August 2021, Mahamoud Warsame sent an email to Aimee Bock containing two MDE site transfer request forms for Southside Youth and another site called "Southside Child Development Center." The forms requested that both sites be transferred to Feeding Our Future from another site sponsor.

147.   On or about October 1, 2021, Mahamoud Warsame sent another email to Aimee Bock. Attached to the email was an invoice from Metro Area Catering, the vendor for the Taylor Site. The invoice claimed that Metro Area Catering had both breakfast and lunch to 1,500 children a day for 8 days in September 2021 and that the company was entitled to a $74,250 in Federal Child Nutrition Program reimbursements from Feeding Our Future. The address listed for Metro Area Catering was 2501 Taylor Street NE, Minneapolis, Minnesota, which was the former location of the Taylor Site.[3]

---

[3]   Feeding Our Future referred to the Taylor Site as "Feeding Our Future Taylor" because it used to be located at 2510 Taylor Street NE before "transferring" to 2854 Columbus Avenue South.

| From | | | | | |
|------|--|--|--|--|--|
| Metro Are Catering | | | | | **INVOICE** |
| 2501 Taylor Street NE Minneapolis MN 55418 | | | | | |

**To**

| Feeding Our Future MN OR Joseph's Poir | | | |
|------|--|--|--|
| 3055 Old Hwy 8 Suite#312, St Anthony, MN 55418 | | Invoice # | 10056 |
| | | Invoice Date | 10/01/2021 |
| | | Due Date | 10/01/2021 |

| Item | | Description | Unit Price | Quantity | Amount |
|------|--|-------------|-----------|----------|--------|
| | | BREAKFAST AT 1500 PER DAY FOR 8 DAYS SEPTEMBER | 2.00 | 13500.00 | 27000.00 |
| | | LUNCH AT 1500 PER DAY FOR 8 DAYS SEPTEMBER | 3.50 | 13500.00 | 47250.00 |

New Line

**Notes**

| | Subtotal | 74250.00 |
|--|----------|----------|
| | Total | 74250.00 |
| | Amount Paid | 0.00 |
| | Balance Due | $74250.00 |

148. In all, MDE records show that Feeding Our Future received more than $2.5 million in Federal Child Nutrition Program reimbursements for meals purportedly served at the Taylor Site in 2021. Southside Youth, the other location that Aimee Bock claimed was serving children from 2854 Columbus Avenue South, received more than $500,000 in Federal Child Nutrition Program funds in 2021.

VI.   **AIMEE BOCK AND OTHER FEEDING OUR FUTURE EMPLOYEES USED SHELL COMPANIES TO FRAUDULENT MISAPPROPRIATE FEDERAL CHILD NUTRITION PROGRAM FUNDS**

149.   The investigation has revealed that several Feeding Our Future employees set up shell companies that they used to fraudulently misappropriate Federal Child Nutrition Program funds from Feeding Our Future. These employees include Feeding Our Future's Executive Director, Aimee Bock. In addition, at least two other Feeding Our Future employees appear to have fraudulently misappropriated federal funds from Feeding Our Future: (1) Abdikerm Abdelahi Eidleh, a "Program Support Manager" at Feeding Our Future; and (2) Hadith Yusuf Ahmed, the "Director of Growth and Development."

A.   **Aimee Bock Stole More than $600,000 in Federal Child Nutrition Program Funds Through a Shell Company**

150.   The investigation has revealed that Aimee Bock misappropriated approximately $600,000 in Federal Child Nutrition Program funds through a shell company owned by her live-in boyfriend.

151.   Bank records show that approximately $600,000 in Federal Child Nutrition Program funds were sent to a Wells Fargo account in the name of Handy Helper's [sic] LLC between March 2020 and July 2021. Empress Malcolm Watson Jr., who lives with Aimee Bock and is believed to be her boyfriend, is the sole signatory on the account. Aimee Bock is not listed as a signatory on the account but bank records show that she signed checks drawn on the account. Aimee Bock's home address is listed on both the bank account and incorporation documents for Handy Helper's LLC.

152.    Essentially all of the money deposited into this account were Federal Child Nutrition Program funds obtained from Feeding Our Future. Bank records show that this money was not used to purchase food or otherwise participate in the Federal Child Nutrition Program. Instead, the money was converted to personal use, with approximately $184,000 being withdrawn in cash and another approximately $113,000 transferred to a personal account held by Empress Malcolm Watson Jr.

153.    A significant amount of money from the Handy Helper's LLC account was used to fund an extravagant trip to Las Vegas, including more than $21,000 at Royalty Exotic, a luxury car rental agency, $9,000 at Caesar's Palace, $6,700 at Gucci, and $3,500 at Louis Vuitton.

154.    The Federal Child Nutrition Program funds deposited into the Handy Helper's LLC account were also used to make more mundane purchases, including more than $14,000 at both Dick's Sporting Goods and Home Depot.

**B.    Hadith Yusuf Ahmed Stole More than $1.1 Million in Federal Child Nutrition Program Funds Through a Shell Company**

155.    The investigation has shown that Hadith Yusuf Ahmed also misappropriated Federal Child Nutrition Program funds from Feeding Our Future through the use of a shell company. According to MDE records, Hadith Yusuf Ahmed is the "Director of Growth and Development" for Feeding Our Future.

156.    Minnesota Secretary of State records show that Hadith Yusuf Ahmed created a company called Southwest Metro Youth in or about October 2020. Hadith Yusuf Ahmed submitted the company's articles of incorporation when he opened the company. The articles of incorporation explained the purpose of Southwest Metro

Youth, which included to provide "educational after-school programs" and "to combat youth crime."

> **The purpose of this corporation is:**
>
> • **to provide social and educational after-school programs**
>
> • **to provide social, indoor and outdoor activities**
>
> • **to help bring families and youth together through sports and other indoor and outdoor social activities**
>
> • **to combat youth crime within the neighborhoods; and**
>
> • **to prevent community deterioration.**

157.   Shortly after incorporating Southwest Metro Youth, Hadith Yusuf Ahmed opened an account for his new company at Wells Fargo. A review of bank records show that Hadith Yusuf Ahmed did not use Southwest Metro Youth to provide after-school programs for children. Instead, he used the account to misappropriate Federal Child Nutrition Program funds. In January 2021, Hadith Yusuf Ahmed began depositing large checks from Feeding Our Future into the account. For example, on or May 5, 2021, Hadith Yusuf Ahmed deposited a check for $305,819 from Feeding Our Future to Southwest Metro Youth.



158.   In all, Hadith Yusuf Ahmed deposited a total of $1.1 million in checks from Feeding Our Future between January and May 2021. This represented nearly 99 percent of the funds deposited into the account.

| Date | Amount |
|------|--------|
| January 20, 2021 | $100,000 |
| February 1, 2021 | $13,708 |
| February 12, 2021 | $230,417 |
| March 8, 2021 | $188,628 |
| May 5, 2021 | $305,819 |
| May 19, 2021 | $295,389 |
| **Total** | **$1,135,963** |

159.   Bank records show that Hadith Yusuf Ahmed did not use this money to provide after-school programs or combat youth crime. Nor did he use the money to purchase food or serve meals to underprivileged children. Instead, he transferred about 80 percent of this money to entities controlled by Abdikerm Abdelahi Eidleh, including Hope Suppliers LLC and Bridge Logistics LLC. In all, bank records show that Hadith Yusuf Ahmed transferred approximately $843,000 to accounts held by Abdikerm Abdelahi Eidleh in the name of Hope Suppliers LLC or Bridge Logistics

LLC. As described below, these accounts and entities were used by Abdikerm Abdelahi Eidleh to misappropriate Federal Child Nutrition Program funds.

**C.    Abdikerm Abdelahi Eidleh Stole More than $300,000 in Federal Child Nutrition Program Funds Through a Shell Company**

160.    Abdikerm Abdelahi Eidleh also fraudulent misappropriated Federal Child Nutrition Program funds from Feeding Our Future through the use of a shell company called Hope Suppliers LLC. Abdikerm Abdelahi Eidleh worked as the "Program Support Manager" at Feeding Our Future.

161.    The investigation has shown that Abdikerm Abdelahi Eidleh used a shell company called Hope Suppliers LLC to misappropriate Federal Child Nutrition Program funds from Feeding Our Future. Minnesota Secretary of State records show that Abdikerm Abdelahi Eidleh created Hope Suppliers LLC in December 2020. He then opened several bank accounts in the name of his new company.

162.    Bank records show that on or about October 8, 2021, Abdikerm Abdelahi Eidleh deposited a $343,064 check into the Hope Suppliers LLC account at JP Morgan Chase Bank. This check was written from Feeding Our Future.

163.   Bank records show that this money was not used to purchase food or meals. As explained below, Abdikerm Abdelahi Eidleh used this and the other money received into the Hope Suppliers LLC bank accounts for personal spending.

**D.   Abdikerm Abdelahi Eidleh and Hadith Yusuf Ahmed Solicited and Received Kickbacks from Federal Child Nutrition Program Sites**

164.   During the investigation, an FBI forensic accountant reviewed bank records for accounts held by Feeding Our Future and Feeding Our Future employees. During her review, the forensic accountant noticed Abdikerm Abdelahi Eidleh had opened a large number of bank accounts. These accounts were held at a number of banks and in the name of a number of corporate entities. After reviewing these accounts, the forensic accountant concluded that Abdikerm Abdelahi Eidleh was using these entities to solicit and receive kickbacks from Feeding Our Future-sponsored sites that were fraudulently receiving Federal Child Nutrition Program funds.

165.   Abdikerm Abdelahi Eidleh appears to have created several limited liability companies for use in soliciting and receiving kickbacks, including Hope Suppliers LLC, Eidleh Inc., Bridge Logistics LLC, Bridge Consulting and Logistics LLC, Delta Food Services LLC, Math Tech Tutoring LLC, and Ideal Takeout LLC. Minnesota Secretary of State records show that Abdikerm Abdelahi Eidleh created most of these companies between November 2020 and February 2021.

166.   Bank records show that Abdikerm Abdelahi Eidleh deposited more than $4.4 million into bank accounts held by these companies in 2020 and 2021. Most of these deposits came from entities that fraudulently misappropriated Federal Child

Nutrition Program funds. For example, Abdikerm Abdelahi Eidleh received more than $500,000 from entities created and used to launder the proceeds of Safari Restaurant's scheme to fraudulently obtain and misappropriate Federal Child Nutrition Program funds.

| Entity | Amount |
|---|---|
| Tunyar Trading LLC | $225,999 |
| Horseed Management LLC | $112,000 |
| Salim Limited LLC | $49,000 |
| Cosmopolitan Business Solutions LLC | $42,000 |
| Olive Management Inc. | $38,000 |
| ASA Limited LLC | $35,000 |
| AG Limited LLC | $5,000 |
| **Total** | **$506,999** |

167.   Abdikerm Abdelahi Eidleh also deposited approximately $843,000 from Southwest Metro Youth, the company created by Hadith Yusuf Ahmed and used to misappropriate $1.1 million in Federal Child Nutrition Program funds from Feeding Our Future.

168.   Bank records show that Abdikerm Abdelahi Eidleh did not use this money to provide food or meals to underprivileged children. Instead, he appears to have used much of the funds in the accounts of his various shell companies to fund his lifestyle and enrich himself. For example, he paid approximately $212,000 towards the mortgage on his home (a/k/a **Subject Premises 5**). He also sent approximately $88,000 to Coinbase.com, an online cryptocurrency exchange, and $73,000 to an online currency trading brokerage. Bank records show that he spent $50,000 at a jewelry store in Dubai.

169.    Hadith Yusuf Ahmed also appears to have solicited and received kickbacks from sites under the sponsorship of Feeding Our Future. Hadith Yusuf Ahmed solicited and receiving these kickbacks through a shell company called Mizal Consulting LLC. According to Minnesota Secretary of State records, Hadith Yusuf Ahmed created Mizal Consulting LLC in or about December 2020. Mizal Consulting had an account at Wells Fargo Bank. Bank records show that Hadith Yusuf Ahmed also used this account to fraudulently receive, launder, and misappropriate Federal Child Nutrition Program funds.

170.    Bank records show that approximately $875,000 was deposited into the Mizal Consulting LLC account between December 2020 and December 2021. Nearly all of this money was Federal Child Nutrition Program funds received from entities involved in the program under the sponsorship of Feeding Our Future. This included approximately $65,000 from Bushra Wholesalers LLC. On or about January 12, 2022, Magistrate Judge Tony N. Leung signed a federal search warrant for the office Bushra Wholesalers LLC based on the company's involvement in fraudulently receiving, laundering, and misappropriating Federal Child Nutrition Program funds.

## VII.    COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

171.    Based upon my knowledge, training, experience, and the experience of other law enforcement personnel, I know that computer hardware and computer software may be utilized to store records which include, but are not limited to: those relating to business activities, criminal activities, associate names and addresses, victims' names, addresses, and images, the identity and location of assets illegally gained through criminal activity, and other information related to criminal activity.

172.    As described above and in Attachment B, this application seeks permission to search for records that might be found at the Subject Premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

### Probable Cause to Seize Electronic Devices at Subject Premises

173.    I submit that if a computer, cellular telephone, or other storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are

overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

      d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

      e.    Based on actual inspection of other evidence related to this investigation, including emails obtained through search warrants, I am aware that computer equipment was used to carry out this fraud scheme. There is reason to believe that there is a computer system currently located on the Subject Premises.

    174.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Subject Premises because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy"

while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example,

information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

   c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  175. I know that when an individual uses a computer to commit a crime the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of

crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

176. *Necessity of seizing or copying entire computers or storage media.* Based upon my knowledge, training and experience, and the experience of other law enforcement personnel, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, all computer equipment, should be processed by a qualified computer specialist in a laboratory or other competent setting. This is due to:

a. *The volume of evidence.* Computer storage devices (like hard disks, removable media, optical media, diskettes, tapes, laser disks, Bernoulli drives) can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names, or use encryption or steganography software. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site;

b. *The technical requirements.* Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly

controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze a system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (from external sources or destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis. Further, when a user deletes a file on a computer, only the pointer (a tool that tells the operating system where the file is located on the media) to the file is deleted. The actual file may remain on the media for a long period of time, possibly years. Forensics examiners can use software tools that can locate and partially and/or fully recover deleted files;

      c.    *System functionality.* Computer systems are very complicated and the proper operation of the system may be dependent upon the hardware that is connected to it. For this reason, it is usually necessary to seize all hardware connected to the equipment in order to ensure the proper operation of the system during the analysis process.

      d.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities

to employ techniques, including, but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

177.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

178.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and

falls within the scope of the warrant. As set forth above, the Subject Premises are locations from which fraudulent companies are being run and where multiple individuals who, together, commit fraud together may be found. In my training and experience, I know that business locations often contain a variety of electronics, to include computers and cellular telephones. I further know that in this case, such electronic are being actively used to carry out the fraud scheme. Digital devices found at the Subject Premises may or may not have a clearly identifiable user based on the exterior of the device and/or may have multiple users whose biometric features may unlock the devices. Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the Subject Premises during the execution of the search: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VIII. CONCLUSION

179. Based on the facts set forth above, and based on my training, experience, knowledge, and the aforementioned facts of this investigation, there is probable cause to believe that evidence and instrumentalities of mail fraud, wire fraud, conspiracy, and money laundering, in violation of 18 U.S.C. §§ 1341, 1343, 1349, 1956 and 1957, as described in Attachment B, can be found at the Subject Premises, as further described in Attachment A-1 to A-6.

Respectfully submitted,

FBI Special Agent Travis Wilmer

SUBSCRIBED and SWORN before me by reliable
electronic means (FaceTime, Zoom and/or email)
pursuant to Fed. R. Crim. P. 41(d)(3)

Jan. 14, 2022

The Honorable Tony N. Leung
United States Magistrate Judge

**Attachment A-2**

Subject Premises 2 is the single-family home located at 13299 Bronze Parkway, Rosemount Minnesota 55068. 13299 Bronze Parkway is located on the west side of Bronze Parkway, just north of 133rd Street West.



13299 Bronze Parkway is a single-family home with tan siding, a white garage door, and a blue front door. The numbers "13299" appear above the garage door.

 

**ATTACHMENT B**
**(List of Items to be Seized)**

Items to be seized include all evidence of violations of Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1349 (conspiracy), 1956 and 1957 (money laundering), for the period of January 1, 2017 through the present, related to a scheme to fraudulently obtain and misappropriate federal child nutrition program funds, including the following:

1.  All documents, correspondence, or information related to Feeding Our Future's participation in Summer Food Service Program, Child and Adult Care Food Program, and other federal child nutrition programs ("federal child nutrition programs"), including applications, site contracts, vendor contracts, reimbursement claims, invoices, receipts, payments records of meals served, employee rosters, site rosters and tallies of children served, menus, advertising, policies and procedures, emails and communications with staff, and leases.

2.  All correspondence or communication with the Minnesota Department of Education, U.S. Department of Agriculture, or companies and entities participating in the federal child nutrition programs, including sites, vendors, and sponsoring agencies, related to participation in federal child nutrition programs.

3.  All personal financial documents, records and information for Aimee Marie Bock, Empress Malcolm Watson Jr., Abdikerm Abdelahi Eidleh, and Hadith Yusuf Ahmed, including but not limited to the following:

   a.  Financial records including bank statements, deposit tickets, canceled checks, credit and debit memos, wire transfers, bank money orders, cashier's

1

checks, investment records, stock and bond records, loan records, safety deposit box records, financial statements, tax returns, and records utilized in the preparation of tax returns;

      b.    Retained copies of personal and business tax returns;

      c.    Receipts and other documents showing disbursement of funds and ownership of assets, including purchases of real estate and other assets, home improvement, and casino player cards; and

      d.    Documents showing the location of other records including receipts and contracts for rental units, and change of address or post office box records.

      4.    All documents, records and information pertaining to Feeding Our Future, Handy Helper's [sic] LLC, Hope Suppliers LLC, Bridge Logistics LLC, Bridge Consulting and Logistics LL, Eidleh Inc., Delta Food Services LLC, Math Tech Tutoring LLC, Ideal Takeout LLC, Southwest Metro Youth, Mizal Consulting, and any associated entities or companies, including the following:

      a.    Accounting records including financial statements, chart of accounts, account ledgers, general ledgers, cash receipt journals, cash disbursement journals, payroll registers, check registers, accounts payable ledgers, accounts receivable ledgers, general journal and overhead rates and calculations;

      b.    Records that show ownership, control, affiliation, and operation of Feeding Our Future, Handy Helper's [sic] LLC, Hope Suppliers LLC, Bridge Logistics LLC, Bridge Consulting and Logistics LL, Eidleh Inc., Delta Food Services

LLC, Math Tech Tutoring LLC, Ideal Takeout LLC, Southwest Metro Youth, Mizal Consulting, or any other associated companies, entities, investments, or assets, including but not limited to articles of incorporation, corporate resolutions or minutes, other business or corporate records, memoranda, by-laws, shareholder information, donor information, service agreements, partnership agreements, memoranda of understanding, and other documents evincing ownership, control, affiliation, and operation.

   c. Financial records including bank statements, deposit tickets, canceled checks, credit and debit memos, wire transfers, bank money orders, cashier's checks, investment records, stock and bond records, safety deposit box records, tax returns, and records utilized in the preparation of tax returns;

   d. Personnel files and employee information for all employees, volunteers, and/or independent contractors, including, but not limited to, payroll records, time sheets and other records of work performed, applications for employment, background checks, Forms 1099, Forms W-2, and Forms W-4; and

   e. Business records including invoices, statements, contracts and agreements, purchase and sale records, records of donations, and correspondence.

  5. All documents, records, and information pertaining to sites, vendors, companies or entities participating in the Summer Food Service Program, Child and Adult Care Food Program, and other federal child nutrition programs including the following:

a.      Any and all records and evidence related to participation in federal child nutrition programs, including applications, site contracts, vendor contracts, reimbursement claims, invoices, receipts, payments records of meals served, employee rosters, site rosters and tallies of children served, menus, advertising, policies and procedures, emails and communications with staff, and leases.

b.      Accounting records including financial statements, chart of accounts, account ledgers, general ledgers, cash receipt journals, cash disbursement journals, payroll registers, check registers, accounts payable ledgers, accounts receivable ledgers, general journal and overhead rates and calculations;

c.      Records that show ownership, control, affiliation, and operation of companies and entities participating in federal child nutrition program, including but not limited to articles of incorporation, corporate resolutions or minutes, other business or corporate records, memoranda, by-laws, shareholder information, donor information, service agreements, partnership agreements, memoranda of understanding, and other documents evincing ownership, control, affiliation, and operation.

d.      Financial records including bank statements, deposit tickets, canceled checks, credit and debit memos, wire transfers, bank money orders, cashier's checks, investment records, stock and bond records, safety deposit box records, tax returns, and records utilized in the preparation of tax returns;

4

e.      Personnel files and employee information for all employees, volunteers, and/or independent contractors, including, but not limited to, payroll records, time sheets and other records of work performed, applications for employment, background checks, Forms 1099, Forms W-2, and Forms W-4; and

f.      Business records including invoices, statements, contracts and agreements, purchase and sale records, records of donations, and correspondence.

6.      Property records, receipts, investment records, stock and bond records, mortgages, rental or lease agreements, promissory notes, handwritten notes, calendars, day planners, logs, records related to wire transfers or reflecting financial transactions, and records related to or tending to identify the source, accumulation, disposition, location or ownership of assets, money, wealth, property, safe deposit records, and safe deposit keys.

7.      Records reflecting business or personal travel, including passports;

8.      Information that constitutes evidence of meals served to underprivileged children.

9.      Cash or cash equivalent, coins, stocks, bonds, gold, jewelry, watches or other proceeds of the fraud offense.

10.     Correspondence, memos, reports, notes, and e-mails pertaining to the business and personal financial affairs described above.

11.     All documents and records tending to show the identities of associates or co-conspirators, or tending to show the location of assets including notes, telephone

5

messages, telephone numbers, email addresses, address books, and appointment books.

12. Smartphones or cellular telephones, computers, tablet computers, and other digital storage media that may contain any of the records or information described above.

13. Any computer software (and related instructions or manuals) that was used or may have been used to operate the computer hardware listed above, access remote computers, communicate with others, or to manage and record financial transactions, including but not limited to Internet browsers, Internet access software, word processing programs, email software, banking software, business management tools, and accounting software.

14. Any access devices, records, or information needed to open or fully operate the computer hardware or software listed above, including but not limited to physical keys, account numbers, screen names, passwords, personal identification numbers (PINs), or digital certificates.

15. The terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including hard disks, ZIPdisks, optical discs, backup tapes, smart cards, memory calculators, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or

6

typing); and any photographic form (such as prints, negatives, videotapes, motion pictures, photocopies).

16. Any and all records related to the use of post office boxes, virtual offices, or mail service providers.

17. Items needed to access the information listed above, such as:

    a. Cabinet and desk keys;

    b. Documents and items regarding the rental or use or a storage unit, including contracts, rental agreements, and keys; and

    c. Safe and lock combination and keys.

18. Any digital device capable of storing information related to the commission or attempted commission of the above listed violations, or used to facilitate the above-listed violations, and forensic copies thereof.

19. With respect to any digital-device containing evidence falling within the scope of the foregoing categories of items to be seized:

    a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of

7

malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      c.    evidence of the attachment of other devices;

      d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      e.    evidence of the times the device was used;

      f.    passwords, encryption keys, and other access devices that may be necessary to access the device;

      g.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      h.    records of or information about Internet Protocol addresses used by the device;

      i.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

20.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" includes records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

21.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units, desktops, laptops, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH WARRANT ADDENDUM

1. In conducting the search authorized by this warrant, the government shall make reasonable efforts to utilize search methodology that avoids searching files, documents or other electronically stored information which is not identified in the warrant.

2. If electronically stored data, information, documents or other records have been identified and seized by the government pursuant to this warrant, the government may retain the electronic storage device (e.g., computer, hard drive, mobile device, smartphone, cell phone). The person from whom the electronic storage device was seized may request that the government provide him or her with electronic copies of the data, information, documents or other records by making a written request to the United States Attorney's Office, identifying with specificity the data, information, documents or other records sought to be copied. The government must respond to all such requests within a reasonable amount of time, and must provide a copy of the electronically stored data, information, documents or other records requested unless the copies requested constitute contraband, instrumentalities, or property subject to forfeiture.

3. Nothing in this warrant shall limit or prevent the government from seizing the electronic storage device as contraband or an instrumentality of a crime or commencing forfeiture proceedings against the electronic storage device and the data contained in the device. Nothing in this warrant shall limit or prevent the owner of the electronic storage device, files, software, hardware, data, information, documents or other records from (a) filing a motion with the Court pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure for the Return of Property, or (b) making a request of the government to return certain specified electronic storage devices, files, software, hardware, data, information, documents or other records.

4. The government shall establish a search methodology governing the review of seized data to ensure that no attorney-client privileged communications will be inadvertently reviewed by the prosecution team. In the event that data seized pursuant to this warrant are identified by the government as possibly containing attorney-client privileged communications, an Assistant United States Attorney, who is not a member of the prosecution team and who is not participating in the search, shall act as a "taint team" to set up an ethical wall between the evidence and the prosecution team that will prevent any privileged material from getting through to the prosecution team.