UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-223 (NEB/TNL)

UNITED STATES OF AMERICA,

Plaintiff,

v.

AIMEE MARIE BOCK, ET AL.,

Defendants.

**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS TO SUPPRESS**

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, Joseph H. Thompson, Harry M. Jacobs, Matthew S. Ebert, and Chelsea A. Walcker, Assistant U.S. Attorneys, respectfully submits the following consolidated response to the defendants' motion to suppress found at docket numbers 188, 189, 193, 198, 200, 205, 213, 222, and 236.[1]

## I. BACKGROUND

These motions, and this case, arise out of the investigation into a massive scheme to defraud the Federal Child Nutrition Program, a government aid program designed to provide free meals to children in need. The defendants exploited the Covid-19 pandemic to obtain, misappropriate, and launder tens of millions of dollars

---

[1] The defendants have filed other pretrial motions. Dkt. ##187, 190, 194, 195, 196, 197, 200, 202, 203, 207, 208, 209, 214, 217, 219, 220, 221, and 223. The Court ordered the government to response to these motions separately from the other motions filed by the defendants. Dkt. #256. Many of the defendants' reference one another's motions and arguments. To the extent that any of the motions addressed in this response cover or refer to motions not addressed in the filing, the government would incorporate its response and exhibits to those motions here.

in program funds that were intended as reimbursements for the cost of serving meals and food to children.

The fraud scheme operated as follows. The defendants registered shell companies with the Minnesota Secretary of State. They then enrolled their newly created shell companies in the Federal Child Nutrition Program under the sponsorship of Feeding Our Future. Within a matter of days or weeks, the defendants claimed—falsely—that they were serving meals to thousands of children per day, seven days a week.

In support of these fraudulent claims, the conspirators created and submitted fake documentation to cover up their fraud. The defendants submitted fraudulent meal count sheets purporting to document the number of children and meals served at each site. They also submitted fake invoices purporting to document their purchase of food to be served at the sites. Although some sites did purchase and serve some small amount of food, they obtained fraudulent invoices for inflated quantities of food purchased or meals served to make it appear as though they were serving meals to thousands of children each day. The conspirators also created fake invoices from legitimate food distribution companies in order to cover up their scheme to defraud.

The defendants also submitted fake attendance rosters. The rosters purported to list the name and age of each child that received a meal each day. But the rosters were fake and did not actually track the service of meals to children. Instead, the conspirators created the lists using fake names. Because the program only

2

reimbursed for meals served to children, the conspirators sometimes used an Excel formula to insert a random age between 7 and 17 into the rosters.

Despite knowing the claims were fraudulent, defendant Aimee Bock and Feeding Our Future submitted her co-conspirators' fraudulent claims to the Minnesota Department of Education and then disbursed the fraudulently obtained Federal Child Nutrition Program funds to the individuals and entities involved in the scheme.

Bock and other Feeding Our Future employees solicited and received bribes and kickbacks from individuals who opened fraudulent Federal Child Nutrition Program sites under the sponsorship of Feeding Our Future. Employees of Feeding Our Future created shell companies for use in accepting and hiding the bribe and kickback payments. Individuals who ran sites under the sponsorship of Feeding Our Future paid bribes and kickbacks to Feeding Our Future employees. Many of these bribes and kickbacks were disguised as consulting payments or other legitimate payments to shell companies created by Feeding Our Future employees.

The defendants are charged with conspiracy to commit money laundering. The money laundering conspiracy was designed and carried out to conceal, hide, and launder the proceeds of the fraudulent scheme to obtain Federal Child Nutrition Program funds. As part of their money laundering conspiracy, the defendants created limited liability companies for use in hiding the source and ownership of proceeds of the fraudulent scheme to obtain Federal Child Nutrition Program funds. Some of these companies purported to be meal vendors providing meals and food to the

3

Federal Child Nutrition Program sites. In reality, these companies were shells designed to disguise the source and ownership of the proceeds of the fraud scheme.

The defendants also created shell companies in order to receive, misappropriate, and launder the proceeds of their fraud scheme. The defendants transferred funds among their shell companies in order to conceal the source of nature of the funds. After laundering the proceeds of their scheme, the defendants used their shell companies to purchase real estate, cars, and other personal items.

On September 13, 2022, a grand jury charged eight defendants with engaging in this fraud scheme. Dkt. #1. The indictment charged all defendants with conspiracy to commit wire fraud (Count 1), in violation of 18 U.S.C. §§ 371 and 1342. Individual defendants were also charged with wire fraud, in violation of 18 U.S.C. § 1343, conspiracy to commit federal programs bribery, in violation of 18 U.S.C. § 666, federal programs bribery, in violation of 18 U.S.C. § 666, conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a), and money laundering, in violation of 18 U.S.C. § 1957.

## II.    FEDERAL SEARCH WARRANTS

Several defendants have moved to suppress evidence obtained during the execution of federal search warrants. Some of these defendants ask—or appear to be asking—the Court to conduct a "four-corners" review of the search warrants and supporting affidavits and decide whether the Magistrate Judges erred in finding that there was probable cause supporting the warrants.

Other motions request that the Court conduct an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).

A.    **The Legal Standard**

1.    **The Probable Cause Standard**

Probable cause is defined as a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996). A search must be upheld if the issuing judge had "a substantial basis" for finding the existence of probable cause. *Gates*, 462 U.S. at 239. In reviewing the sufficiency of a properly obtained search warrant, courts give "great deference to a magistrate's determination as to whether an affidavit establishes probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005).

Probable cause is determined from the "totality of the circumstances" presented by the application for the search warrant. *Gates*, 462 U.S. at 238. A warrant affidavit must be "viewed as a whole, and the reviewing magistrate is to examine its totality." *See Gates*, 462 U.S. at 230–31; *Anderson*, 933 F.2d at 614 ("the affidavit cannot be attacked paragraph by paragraph; it must be evaluated as a whole"). It "should be read with common sense and not in a grudging, hyper technical fashion." *Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998). "When the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999) (quoting *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)).

The affidavit supporting the issuance of the search warrant "should be examined under a common sense approach and not in a hypertechnical fashion." *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993). An affiant "is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not." Arnold, 725 F.3d at 898-99. Rather, a warrant affidavit "need only show facts sufficient to support a finding of probable cause." *United States v. Ozar*, 50 F.3d 1440, 1445 (8th Cir. 1995) (quoting *United States v. Dennis*, 625 F.2d 782, 791 (8th Cir. 1980)).

### 2.    Good Faith Reliance on Judicially Authorized Search Warrants

Of course, even if the search warrants were not supported by probable cause—and they were—all of the evidence seized during the execution of the search warrants would nevertheless be admissible under to the good-faith exception established in *United States v. Leon*, 468 U.S. 897 (1984). Under *Leon*, evidence obtained pursuant to a search warrant that is later determined to be invalid need not be excluded if the executing officer objectively and reasonably relied in good faith upon the determination of probable cause and technical sufficiency by the issuing judge. *Id.* at 922-23; *United States v. Terry*, 305 F.3d 818, 823 (8th Cir. 2002).

*Leon* is premised upon the recognition that because the purpose of the exclusionary rule is to deter police misconduct, its purpose is not served when the police rely in good faith on a warrant issued (in error) by a neutral magistrate. The ultimate question under *Leon* is whether the officers had an "objectively reasonable

6

basis to believe they were complying with [applicable law] and the Fourth Amendment." *United States v. Moore*, 956 F.2d 843, 848 (8th Cir. 1992).

### 3.    *Franks* Motions

Each of the challenged searches was conducted in good faith reliance on federal search warrants signed and issued by federal Magistrate Judges. In attempt to get around this fact, several defendants have requested an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) on the grounds that the affidavits submitted in support of the search warrant applications contained intentionally false and material statements. Because the defendants have not made the "substantial preliminary showing" to obtain such a hearing, their motions should be denied.

A defendant seeking a *Franks* hearing must make a "substantial preliminary showing." *United States v. Lucca*, 377 F.3d 927, 931 (8th Cir. 2004). "[T]o merit a Franks hearing, [a defendant] must show both (1) that the affiant 'knowingly and intentionally' made false statements or made them in 'reckless disregard for the truth' and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause." *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013) (cleaned up).

"The requirement of a substantial preliminary showing is not lightly met.'" *Id.* (quoting *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998)); *see also United States v. Crissler*, 539 F.3d 831 (8th Cir. 2008) ("Such a showing is not easily made."). A "mere allegation" of deliberate or reckless falsehoods is not enough to obtain an evidentiary hearing. *Arnold*, 735 F.3d at 899. To obtain a hearing, "[t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those

allegations must be accompanied by an offer of proof." *United States v. Wajda*, 810 F.2d 754, 759 (8th Cir. 1987) (quoting *Franks*, 438 U.S. at 171). The offer must proof must "point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons." *Id.*

Notably, *Franks* only "protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate." *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990) (citing *United States v. Reivich*, 793 F.3d 957, 961 (8th Cir. 1986)). To obtain a hearing, a defendant must also make an offer of proof that the alleged false statement was intentional or reckless. *Wadja*, 810 F.2d at 749.

Finally, material falsehoods and material omissions are not the same for purposes of providing a *Franks* violation. A warrant affidavit "need only show facts sufficient to support a finding of probable cause." *United States v. Ozar*, 50 F.3d 1440, 1445 (8th Cir. 1995) (quoting *United States v. Dennis*, 625 F.2d 782, 791 (8th Cir. 1980)). Accordingly, the omission of information from a search warrant affidavit does not implicate *Franks* unless the omitted information "would have been 'clearly critical' to the finding of probable cause." *Ozar*, 50 F.3d at 1445 (quoting *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)); *see also United States v. Short*, 2 F.4th 1076, 1080 (8th Cir. 2021) ("Therefore, reckless disregard for the truth may be inferred from the omission of information from an affidavit only when the material omitted would have been clearly critical to the finding of probable cause."). Indeed, the Eighth Circuit has cautioned that "[r]arely will an unintentional omission be

grounds for *Franks v. Delaware* relief when complex economic crimes are the subject of the investigation. In such cases, unless the government has lied to the issuing judge, the suppression issue should turn on what was in the government's affidavits, not on what defendants assert with the benefit of hindsight the government should have known." *Ozar*, 50 F.3d at 1445-46.

> **B.    Aimee Bock's Motion for a *Franks* Hearing Dkt. #198**

Defendant Aimee Bock has moved to suppress evidence obtained via search warrants on the Feeding Our Future office in St. Anthony (22-mj-40 (TNL)) and her home in Rosemount (22-mj-39 (TNL)). Her motion does not explain how or why the affidavit supporting the issuance of the search warrants failed to set forth probable cause. Indeed, she ignores entirely the factual allegations in the 66-page affidavit submitted in support of the search warrants. The search warrants and supporting affidavits are attached as Government Exhibits A and B. Among other things, the affidavit set forth evidence that:

a.    sites under the sponsorship of Feeding Our Future fraudulently obtained millions of dollars in federal child nutrition program funds (¶¶47-121);

b.    Feeding Our Future provided fraudulent claims and documentation to MDE (¶¶77-82);

c.    Feeding Our Future ran its own fraudulent sites (¶¶127-48);

d.    Feeding Our Future employees used shell companies to fraudulently misappropriate federal child nutrition program funds (¶¶149, 155-63);

e.    Feeding Our Future employees solicited and received kickbacks from individuals and entities involved in the scheme (¶¶164-70);

   f. Bock herself misappropriated $600,000 in federal child nutrition program funds through a shell company owned by her live-in boyfriend (¶¶ 150-54); and

   g. Bock received a $310,000 kickback from individuals involved in the fraud scheme under the sponsorship of Feeding Our Future. ¶¶122-26.

Bock ignores all of this in her motion. Rather than contest the sufficiency of this evidence set forth in the affidavit, she "maintains that she received no kickbacks while in her role as executive director of Feeding Our Future." Dkt. #198 at 5. She also argues that kickbacks are not "per se illegal." Dkt. #198 at 4.

Bock's claims are trial defenses—and poor ones at that—but are certainly not a basis to throw out a search warrant signed and authorized by a federal judge. A grand jury has returned an indictment charging her with accepting that $310,000 kickback. She has not made any showing that the statements in the affidavit related to her receipt of that kickback were false, let alone that the statements were made "knowingly and intentionally, or with reckless disregard for the truth." And she has not even attempted to argue that the affidavit would not have established probable cause if the paragraphs related to Bock's receipt of a kickback were excised from the search warrant. Of the 66-page affidavit's 179 paragraphs, only five discuss the $310,000 kickback Bock received from the owners of Safari Restaurant. ¶¶18, 122-26. Even without any discussion of the kickback to Bock, the affidavit lays out more than sufficient probable cause to support the issuance of the search warrant.

Bock also maintains that she and her company "were entitled to charge administrative fees" in exchange for sponsoring sites. Dkt. #198 at 3. Maybe so. The affidavit does not claim that the 10 percent administrative fees were illegal kickbacks. The affidavit simply noted that the administrative fees "provided an incentive for Feeding Our Future, and its Executive Director Aimee Bock, to increase the number of sites under its sponsorship as well as the amount of Federal Child Nutrition Program reimbursements each site was receiving." ¶50. This is inarguably true. Even if it were not, the search warrant contained ample probable cause without these two innocuous paragraphs about the administrative fees Feeding Our Future received under the federal child nutrition program.

Accordingly, she is not entitled to a *Franks* hearing and her motion to suppress should be denied.

## C.    Defendant Abdulkadir Nur Salah's Motion for a Four-Corners Review (Dkt. #189)

Abdulkadir Nur Salah has filed a motion to suppress evidence obtained pursuant to two separate federal search warrants—a warrant authorizing the search of his residence and a warrant authorizing the search of his email account. Dkt. #189. He argues that the affidavits submitted in support of these two search warrant applications failed to set forth probable cause and that the Magistrate Judges erred in issuing the search warrants. He asks that the Court conduct a "four-corners" review of the affidavit. As explained below, the Magistrate Judges did not err in finding that there was probable cause to search Abdulkadir Nur Salah's residence and email account and issuing the search warrants.

### 1.    The Search Warrant for Abdulkadir Nur Salah's Residence

Abdulkadir Nur Salah first moves to suppress evidence obtained during the search of his residence in Columbia Heights, Minnesota, in January 2022. The search was authorized by a federal search warrant signed by Magistrate Judge Tony N. Leung. The search warrant and 61-page supporting affidavit are attached as Exhibit C. Salah claims that the Magistrate Judge lacked probable cause to issue the search warrant because there was no reason to believe that his residence was the office of the shell company he used to receive and launder fraud proceeds, 3017 LLC. Dkt. #189 at 3. But as explained in the 61-page affidavit submitted in the support of the search warrant application, Abdulkadir Nur Salah *himself* listed his residence— the same residence that is the subject of his search warrant challenge—as the "principle executive office" for 3017 LLC with the Minnesota Secretary of State. Exhibit C at ¶39. He also listed his residence as the address for the company's account at Bell Bank. *Id.* at ¶40. Salah's residence was also listed as the company's address on checks the company received from other entities involved in the fraud scheme. *Id.* at ¶41.

Defendant Abdulkadir Nur Salah further listed his residence as the address for Cosmopolitan Business Properties LLC, a company he and other co-conspirators used to purchase a commercial building with fraud proceeds. *Id.* at ¶43; *see also* ¶¶126-33 (discussing Abdulkadir Nur Salah's purchase of a building using $2.8 million in federal child nutrition program funds as well as the laundering of those funds through 3017 LLC, Cosmopolitan Business Properties, and other entities). As the search warrant affidavit noted, postal records showed he received mail addressed

to this company at his residence within a month of the execution of the search warrant. *Id.* at ¶44.

Abdulkadir Nur Salah argues that his shell companies "merely received fraud proceeds" and that such allegations were insufficient to establish probable cause to search the residence he listed as their offices. Dkt. #189 at 3-4. First, the fact that proceeds of the fraud scheme were sent to a shell company set up by Salah is evidence that he was involved in the fraud. But of course, the allegations in the affidavit go far beyond Salah's receipt of fraud proceeds. The affidavit contains extensive evidence about the involvement of Abdulkadir Nur Salah's restaurant, Safari Restaurant, in the fraud scheme, including evidence that Safari Restaurant claimed to be serving meals to 5,000 or 6,000 children a day (Gov't Ex. C, F at ¶¶68-70, 84-85) as well as evidence that Abdulkadir Nur Salah's Safari Restaurant submitted identical false invoices claiming that the company was serving meals at sites at Safari and other sites run by owners of Safari Restaurant, including Stigma Free Mankato, Stigma Free Willmar, Brava Restaurant, Olive Management, and ASA Limited. *Id.* at ¶¶87-88. As explained in the affidavit:

> [E]ach of the invoices was identical. The invoices charged for the serving of 2,000 meals per day for all 31 days of July 2021. They billed Feeding Our Future at a rate of $7.11 per meal. This resulted in charges of $14,220 a day and $440,820 for the month for each of the five sites. In total, the five invoices sent on August 3, 2021, billed $2,204,100 to Feeding Our Future, which was responsible for distributing Federal Child Nutrition Program funds to these sites. This $2.2 million was for the one month of July 2021.

*Id.* at ¶¶87-88.

13

The affidavit goes on to discuss how much of the federal child nutrition program funds were sent to shell companies created by Abdulkadir Nur Salah and his co-conspirators to receive and launder the proceeds of the fraud. Gov't Ex. C at ¶¶89-110. The affidavit sets forth evidence that Abdulkadir Nur Salah used his shell companies 3017 LLC and Cosmopolitan Business Properties to receive and launder the proceeds of the fraud scheme. *Id.* at ¶¶92-94, 105-06, 126-33. Abdulkadir Nur Salah's use of 3017 LLC to receive and launder the proceeds of the fraud scheme forms the basis of Count 41 of the indictment, which charges Abdulkadir Nur Salah with money laundering in violation of 18 U.S.C. § 1956. Dkt. #1 at ¶187 ("ABDULKADIR SALAH used 3017 LLC as a shell company to hide and disguise the source and ownership of his portion of the fraud proceeds. Between in or about November 2020 and January 2022, ABDULKADIR SALAH deposited more than $4 million in Federal Child Nutrition Program funds into 3017 LLC bank accounts. Among other things, he used this money to purchase real estate and cars.").

Among other things, the affidavit details how Abdulkadir Nur Salah used both 3017 LLC and Cosmopolitan Business Properties to receive and launder fraud proceeds and use them to purchase a building for $2.8 million. Gov't Ex. C at ¶¶126-33. Indeed, the money laundering was so extensive that the affidavit included a chart showing the flow of proceeds through the various shell companies created by Abdulkadir Nur Salah and his co-conspirators.



*Id.* at ¶128. This transaction forms the basis for Count 52 of the indictment, which charges Abdulkadir Nur Salah with money laundering in violation of 18 U.S.C. § 1957. Dkt. #1 at 51.

Finally, the affidavit contains evidence that Abdulkadir Nur Salah paid a $310,000 kickback to Aimee Bock. Gov't Ex. C at ¶¶149-55. Count 40 of the

indictment charges Abdulkadir Nur Salah and Aimee Bock with paying/receiving this illegal kickback, in violation of 18 U.S.C. § 666. Dkt. #1 at 41.

In light of this evidence, Magistrate Judge Leung did not err in finding there was probable cause to search Salah's residence. And, even if he had, the government relied on the warrant in good faith.

### 2.    The Search of Abdulkadir Nur Salah's Email Account

Abdulkadir Nur Salah also moves to suppress emails obtained pursuant to a search of his email account. Dkt. #189 at 4-5.[2] This search was authorized by a federal search warrant signed by Magistrate Judge David T. Schultz. Gov't Ex. D. Nevertheless, Abdulkadir Nur Salah argues that there was not probable cause to search the account and that Magistrate Judge Schultz erred in issuing the search warrant. Specifically, he claims there the affidavit supporting the search warrant application fails to establish a nexus between the account and the fraud scheme. This is not true. The affidavit explains that Abdulkadir Nur Salah listed the email account as his contact for 3017 LLC, the shell company he created and used to receive and launder fraud proceeds. Gov't Ex. D at ¶135. The affidavit further sets forth evidence that Abdulkadir Nur Salah used the email account to send receipts and invoices purporting to document the purchase of food to Aimee Bock, the Executive Director of Feeding Our Future. *Id.* at ¶¶136-38. Abdulkadir Nur Salah also listed his email

---

[2]    Defendant Abdulkadir Nur Salah references the search of Safari Restaurant itself but does not discuss it in his motion to suppress. Accordingly, it is not clear to the government whether he is moving to suppress evidence obtained during those searches. To the extent he is, the government has attached the search warrant authorizing that search as Government Exhibit F.

account as the contact for Cosmoplitan Business Properties LLC in connection with its purchase of a building using $2.8 million in federal child nutrition program funds in June 2021. *Id.* at ¶96. In light of this evidence, Magistrate Judge Schultz correctly found there was probable cause to believe evidence of fraud and money laundering schemes would be found in Abdulkadir Nur Salah's email account.

Of course, even if the affidavit supporting these search warrants failed to adequately establish probable cause to search the accounts, suppression would not be appropriate because law enforcement acted in good faith reliance on federal search warrant issued by Magistrate Judge Shultz.

### 3.    Abdulkadir Nur Salah's Motion for a *Franks* Hearing

Defendant Abdulkadir Nur Salah also asks the Court to hold an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 152 (1978).[3] Dkt. #188. He claims that the affidavits supporting the search warrant affidavits failed to fully explain aspects of the federal child nutrition program and bank records that he claims would have shown he and his co-defendants "were entitled to profit" and "made a plausible margin on his business."

Defendant's request for a *Franks* hearing should be denied. Rather than identify specific misstatements in the search warrant affidavit, he claims that the

---

[3]    Defendants Salim Said and Abdirahman Mohamud Ahmed have moved to join in defendant Abdulkadir Nur Salah's request for a Franks hearing with respect to the search of Safari Restaurant. Dkt. ##200, 222. Defendant Ahmed Artan also requested to join in the request for a Franks hearing, but does not specific which search warrant he is challenging. Dkt. #236. Accordingly, the motion should be denied as to him until and unless he can identify a search warrant of a location for which he has a Fourth Amendment privacy interest giving him standing to file a motion to suppress.

government failed to provide a defense spin on the evidence and argues that if the government waded through everything it would conclude he was not guilty. As explained below, this is not true. The evidence in this case is overwhelming. More relevantly, at is core, his motion attempts to raise trial defenses under the guise of *Franks* in an attempt to obtain a mini-trial on the sufficiency of the government's evidence. But a Franks hearing is not a motion for summary judgment. It is not an opportunity for the defense to force the government to prove its case in a pre-trial hearing. Indeed, as explained above, the Eighth Circuit has held that "[r]arely will an unintentional omission be grounds for *Franks v. Delaware* relief when complex economic crimes are the subject of the investigation." *Ozar*, 50 F.3d at 1445-46. Instead, in cases such as this, absent an outright lie, any suppression motion "should turn on what was in the government's affidavits, not on what defendants assert with the benefit of hindsight the government should have known." *Id*.

Turning to his motion, defendant first argues that the search warrant affidavit failed to fully explain the details of the changes to the federal child nutrition programs implemented during the Covid-19 pandemic. While he concedes that the affidavit's description of the USDA waivers was accurate (Dkt. #188 at 5), he argues that the government intentionally omitted addition detail about those waivers that appear to form the basis of his trial defense. His claims are not supported by an affidavit; his offer of proof is limited to citations to federal regulations and the MDE website. This alone is grounds for denying his motion.

Moreover, Abdulkadir Nur Salah and his co-defendants are not charged with making excessive profits from the federal child nutrition program. They are charged with fraud, money laundering, and kickbacks. Specifically, they are charged with fraudulently claiming that they fed meals to thousands of children a day, which resulted in them receiving more than $40 million in federal child nutrition program funds. They are also charged with creating and using a series of shell companies to receive and launder the proceeds of their fraud scheme. Finally, they are charged with illegally paying kickbacks to Feeding Our Future employees in exchange for Feeding Our Future's sponsorship of their companies' fraudulent participation in the program. None of the additional detail about the USDA waivers cited in his motion authorize the submission of false claims or the payment of kickbacks. Regardless of whatever waivers were in place, federal wire fraud statutes prohibit their submission of fraudulent claims to obtain federal funds. And his claim that he was entitled to make a profit is a trial defense, not a basis for hold a *Franks* hearing.

Similarly, Abdulkadir Nur Salah's claim that Safari Restaurant was located in a "food desert" is a trial defense (and not a good one, at that). Safari Restaurant claimed to be serving meals to as many as 6,000 children a day at its restaurant in south Minneapolis. This is an absurd number. The implausibility of that number taken alongside the evidence that Abdulkadir Nur Salah and the other co-owners of Safari Restaurant transferred millions of dollars in the resulting federal child nutrition program funds to newly created shell companies and then used the funds to purchase real estate and cars is alone sufficient to establish probable cause.

Unsurprisingly, Salah ignores entirely his and his co-conspirators real estate spending spree, which included the purchase of a historical south Minneapolis mansion for $2.8 million (Gov't Ex. C, F at ¶¶126-33), his business partner Salim Said purchase of a house in Plymouth for $1.1 million (*Id.* at ¶¶118-25), and his brother Abdi Nur Salah's purchase of two properties in Minneapolis (*Id.* at ¶¶134-44). He further ignores that he and his co-defendants used federal child nutrition program funds to make these purchases in cash, without any mortgages or bank financing.

Defendant also ignores the portions of the affidavit discussing Safari Restaurant's claims to be providing food to a number of sites located around the state of Minnesota, including a site that claimed to be serving meals to 2,000 children a day in Willmar (population 21,000) as well as sites in Mankato and elsewhere. Gov't Ex. C, F at ¶87. Again, if defendant wants to argue that he and his co-defendants were serving meals to thousands and thousands of kids in cities around the state of Minnesota and that the enormous claims they submitted were not fraudulent, he is welcome to do so at trial. But the affidavit set forth ample probable cause to believe they were not, and that their claims were fraudulent.

Similarly, if Abdulkadir Nur Salah wants to claim that he and his co-conspirators actually served meals but that the food recipients "lied to Safari about their eligibility" (Dkt. #188 at 14), he is welcome to do so at trial. That rather implausible defense theory is not the basis to suppress the results of a properly issued federal search warrant, and it does not come even close to meeting the "substantial preliminary showing" required to obtain a *Franks* hearing.

Abdulkadir Nur Salah next attacks the government's discussion of his and his co-defendants' use of the federal child nutrition proceeds. First, he criticizes the affidavit for focusing on Safari Restaurant's business accounts one at a time, rather than "giving a wholistic view." Dkt. #188 at 19. This is a strange critique. Abdulkadir Nur Salah—who was the signatory on the Safari Restaurant bank accounts—did not have Safari Restaurants accounts open at multiple banks simultaneously. The reality is that banks *routinely closed* Safari Restaurant's accounts due to the suspicious activity in the accounts. Each time a bank closed a Safari Restaurant account due to suspicious activity, Abdulkadir Nur Salah opened a *new* account at a *new* bank. In this way, the serial nature of the bank accounts reflects both the real-time activity of Safari Restaurant's accounts, as well as their fraudulent nature.

For example, Safari Restaurant had an account at Associated Bank from approximately July through October 2020, when the account was closed due to suspicious activity. At the time, Associated Bank also closed accounts in the name of other entities used by Abdulkadir Nur Salah to receive and launder fraud proceeds in October 2020, including accounts held by 3017 LLC (owned by Abdulkadir Nur Salah), Salim Limited LLC (defendant Salim Said), and ASA Limited (defendant Abdihakim Ali Ahmed), as well as defendant Ahmed Ghedi's personal accounts. The bank issued cashier's checks to Abdulkadir Nur Salah and the co-defendants returning the remaining funds in each of the accounts.



In the wake of these account closures, Abdulkadir Nur Salah and his co-conspirators opened new accounts at Bridgewater Bank in October 2020.



Nine months later, in July 2021, Bridgewater Bank concluded that the owners of Safari restaurant appeared to be misusing federal child nutrition program funds and using the accounts to funnel and launder the funds and closed the Safari Restaurant account. Bridgewater Bank also closed the accounts in the name of other entities created by Abdulkadir Nur Salah and his co-conspirators to receive and launder the proceeds of their scheme, including 3017 LLC, Salim Limited LLC, ASA Limited LLC, and Cosmopolitan Business Properties LLC, after concluding that these accounts too had been used for money laundering.

Bridgewater Bank returned Abdulkadir Nur Salah's money via a cashier's check for the $19,327 balance remaining in the account. The bank issued similar checks returning the balances of the other accounts, including a check returning the more than $500,000 that was Abdulkadir Nur Salah's 3017 LLC account.










Two days later, Abdulkadir Nur Salah and his co-conspirators opened new accounts at Wells Fargo, including new accounts for Cosmopolitan Business Solutions dba Safari Restaurant and 3017 LLC.




When he opened the new accounts at Wells Fargo, Abdulkadir Nur Salah deposited the checks he had received when Bridgewater Bank closed the old accounts due to suspicious activity.



Within two weeks of Abdulkadir Nur Salah's opening of the new accounts, Wells Fargo closed them due to its own concern about the suspicious account activity. Wells Fargo issued Abdulkadir Nur Salah cashier's checks returning the money he had deposited into the accounts.



Abdulkadir Nur Salah then opened new accounts at yet another bank, Bell Bank, in July 2021. Once again, he deposited the money from the closed Wells Fargo accounts into the new accounts at Bell Bank.



Abdulkadir Nur Salah was the sole signatory on this account. The account was opened from July 2021 to January 2022, when Bell Bank closed the account after receiving a federal warrant authorizing the seizure of all funds in the account. During this time, it was the only account Safari Restaurant had open. Bank records show that the Bell Bank account received more than $6 million in Federal Child Nutrition Program funds from Feeding Our Future during this time. Bank records show that essentially all the money deposited into the account was derived from federal child

nutrition program funds. And the vast majority of these funds were transferred to individuals or entities charged for their involvement in the fraud scheme.

| Entity | Relation to Fraud Scheme | Amount Received from Safari Restaurant (approximate) |
|---|---|---|
| Tunyar Trading LLC | Owned by defendant Abdikadir Mohamud. Fake vendor company for Stigma Free Willmar site | $956,000 |
| Horseed Management LLC | Owned by defendant Abdinasir Abshir. Fake vendor for Stigma Free Mankato site | $952,000 |
| Brava Restaurant | Site operated by Safari Restaurant group (Gov't Ex. C, F at ¶87) | $919,000 |
| ASA Limited | Owned by defendants Abdihakim Ahmed Salim Said Ahmed Ghedi | $859,000 |
| Olive Management | Ahmed Omar-Hashim | $848,000 |
| Afrique Hospitality Group | Owned by Mukhtar Shariff, who is charged in *United States v. Abdiaziz Farah et al.*, 22 CR 124 (NEB/TNL) | $482,000 |
| Aimee Bock | Executive Director of Feeding Our Future | $310,000 |
| Salim Limited LLC | Owned by defendant Salim Said | $117,000 |
| 1130 Holdings LLC | Owned by Abdihakim Ahmed | $82,000 |
| | **Total** | **$5,525,000** |

If this chart looks familiar, it should. A version of it appeared in the search warrant affidavits. *See* Gov't Ex. C, F at ¶¶93-95. Because the government obtained the search warrants in January 2022, it did not have access to all the Bell Bank account records through the closure of the account on January 21, 2022. In any event, defendant's affiant does not appear to be challenging the portions of the affidavit that discuss the Bell Bank records. In other words, there is no dispute about the accounting. Defendant simply wants the Court to ignore the evidence set forth in the affidavit in favor of his own defense theory. In light of the above sequence of events, it is unsurprising that Salah would prefer the government—and the Court—not examine the sequence of accounts that he opened at various banks over the course of his fraud scheme.

Defendant's desire to re-frame the evidence in a manner consistent with his trial defense is not grounds for a *Franks* hearing. Again, a *Franks* hearing is not a mini-bench trial. The fact that his theory is at odds with the evidence set forth in the search warrant affidavits does not mean that the search warrant affidavit contains false statements. Because defendant has failed to make the substantial preliminary showing necessary to obtain a *Franks* hearing—namely, that the affidavit contained a materially false statement or omission and that the affidavit would not establish probable cause if the false information is excised or the omitted information is included. *Arnold*, 725 F.3d at 898.

Abdulkadir Nur Salah complains further that the search warrant affidavit "does not mention" that he sent $4.6 million from the Safari Restaurant account to

accounts held by other entities, including ASA Limited, Horseed Management, Tunyar Trading, Olive Management, and Brava Restaurant. Dkt. #188 at 20. As an initial matter, it is not true that the affidavits do not discuss the transfer of money from Safari Restaurant to these and other entities. To the contrary, the affidavits cite these transfers as evidence of the defendants' fraud and money laundering scheme. For example, the affidavits explain that Safari Restaurant transferred more than $1.9 million from its Bell Bank to accounts held by Tunyar Trading and Horseed Management. Gov't Ex. C, F at ¶95; Gov't Ex. D at ¶58. The affidavits further explain that these companies "appear to function essentially as shell companies designed to help launder misappropriated and fraudulently obtained Federal Child Nutrition Program funds." Gov't Ex. C, F at ¶¶95-104; Gov't Ex. D at ¶¶59-66.

Abdulkadir Nur Salah further claims that there is no evidence that he or the other owners of Safari Restaurant "knew what was happening at other sites, or that they ever communicated with other site owners about their food program-related operations." Dkt. #188 at 20. This is incorrect. As explained in the affidavits, Safari Restaurant purported to be supplying food for these other sites. As an example, the affidavits describe an August 3, 2021, email to Aimee Bock. According to the affidavit, "[a]ttached to the email was a PDF document titled 'INVOICES FOR SAFARI SITES.pdf' . . . consist[ing] of five separate invoices to Feeding Our Future from Safari Restaurant and sites run by the Safari Restaurant group—Stigma Free Mankato, Stigma Free Willmar, Brava Restaurant, Olive Management, and ASA Limited." Gov't Ex. C, F at ¶87; Gov't Ex. D at ¶50. The affidavits explained that "[e]ach of the

29

invoices was dated July 31, 2021. And each of the invoices was identical." *Id.* According to the affidavit, "[t]he invoices charged for the serving of 2,000 meals per day for all 31 days of July 2021. They billed Feeding Our Future at a rate of $7.11 per meal. This resulted in charges of $14,220 a day and $440,820 for the month for each of the five sites." *Id.* The affidavits even included images of two of these invoices, which purported to show that Safari Restaurant was entitled to federal funds for serving breakfast and lunch to 2,000 children a day, seven days a week, at the Stigma Free Mankato and Olive Management sites.[4]

---

[4]      The owner of Olive Management, Ahmed Omar-Hashim, has pled guilty for his role in the scheme. Dkt. #183. In his plea agreement, he admitted that "[t]he Olive Management site fraudulently claimed to have served meals to 3,000 children a day, seven days a week, at a small storefront deli located in a strip mall in St. Cloud. During the 12-month period from September 2020 to September 2021, the defendant and his co-conspirators fraudulently claimed to have served more than 1.6 million meals to children at the Olive Management site." Dkt. #186 at 2. Omar-Hashim further admitted that he "sent much of this money to his co-conspirators via shell companies created and used to receive and launder the proceeds of the fraud scheme." *Id.* at 3.



*Id.*

Furthermore, to the extent that defendant is making these allegations in connection with his request for a *Franks* hearing, it is only fair to point out that his claim that he did not have any awareness of these other sites or role in preparing or submitting their meal counts and claims is demonstrably false. On December 3, 2021, he sent an email to Feeding Our Future with the subject line "all the companies."

```
all the companies

From:       ABDULKADIR SALAH <abdulkadir.salah@gmail.com>
To:         asia@feedingourfuturemn.org
Date:       Thu, 02 Dec 2021 15:06:02 -0600

    1130 HOLDINGS- STIGMA FREE ST.PAUL.zip
    ASA LIMITED.zip
    BRAVA.zip
    FEEDING OUR YOUTH.zip
    GAUR- BET ON BETTER FUTURE.zip
    HORSEED STIGMA MANKATO.zip
    OLIVE MANAGEMENT.zip
    SAFARI RESTAURANT.zip
    SOUTH CROSS.zip
    STIGMA FREE SAINT CLOUD.zip
    STIGMA FREE WAITE PARK.zip
    TUNAYAR- STIGMA FREE WILMAR.zip

    --
    Abdulkadir Salah
```

Attached to the email were zip files for each of the other entities that had fraudulent federal child nutrition program sites. The zip files themselves contained invoices, meal counts, and rosters supporting each of the site's claims for November 2021. Altogether, in this one email alone, Abdulkadir Nur Salah claimed that the entities he and his co-conspirators created had served more than 800,000 meals in November 2021 for which he claimed they were entitled to more than $4 million in federal child nutrition program funds.

| Site | Total Number of Meals | Amount Claimed |
| --- | --- | --- |
| 1130 Holdings – Stigma Free St. Paul | 119,830 | $612,336 |
| ASA Limited | 59,783 | $305,951 |
| Brava Restaurant | 59,806 | $305,608 |
| Feeding Our Youth | 78,956 | $403,465 |
| Gaur-Bet on Better Future | 58,968 | $301,326 |
| Horseed Management— Stigma Free Mankato | 59,858 | $305,874 |

| | | |
|---|---|---|
| Olive Management | 59,900 | $306,089 |
| Safari Restaurant | 101,751 | $519,947 |
| South Cross | 48,104 | $245,811 |
| Stigma Free St. Cloud | 59,713 | $305,133 |
| Stigma Free Waite Park | 59,858 | |
| Tunyar – Stigma Free Willmar | 59,933 | $306,257 |
| **Total** | **826,550** | **$4,223,670** |

This email and the invoices (but not the meal counts or rosters) are attached as Government Exhibit E. While this email is not in the search warrant affidavit, to the extent the defendant is attempting to obtain a *Franks* hearing by claiming—falsely—that he had no relationship with these other entities, the email is relevant.

Defendant calls the government's statement that he transferred $1.9 million from Safari Restaurant to his shell company, 3017 LLC, misleading because he claims he deposited more than $1 million back into the Safari Restaurant account from 3017 LLC. Dkt. #188 at 23. He claims that his net deposits into 3017 LLC were "clos[er] to $900,000. The government has three responses to this. First, this difference is immaterial. Defendant does not even attempt to offer proof that Magistrate Judge Schultz and Leung would not have signed these warrants if they had this information. Absent such a showing, he is not entitled to a *Franks* hearing. *See Arnold*, 725 F.3d at 898) ("[T]o merit a Franks hearing, [a defendant] must show . . . that if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause."). Second, this is what money laundering looks like. As the search warrant affidavit explained, the "bank records show that the owners of Safari Restaurant transferred most of the money to and from numerous bank

accounts held in the name of an array of entities they controlled. Based on my training and experience, and conversations with FBI forensic accountants, this activity appears to have been designed to launder the money fraudulently obtained from the Federal Child Nutrition Program." *See* Gov't Ex. C, F at ¶107. Finally, defendant's affiant is wrong. A review of all the bank records obtained from Safari Restaurant and 3017 LLC[5] show that Abdulkadir Nur Salah obtained a net of more than $1.6 million from the Safari Restaurant accounts:

| Defendant's Retained Amount Calculation: | | | Government's Calculation: | | |
|---|---|---|---|---|---|
| Cosmopolitan Business Solutions (Safari) Deposits | $ 1,900,000.00 | | Cosmopolitan Business Solutions (Safari) Deposits | $ | 2,728,926.68 |
| Less: Pay back to Safari | $ (1,066,000.00) | | Less: Pay back to Safari | $ | (1,066,000.00) |
| | | | | | |
| 3017 "Retained" Amount | $ 834,000.00 | | 3017 "Retained" Amount | $ | 1,662,926.68 |

But, again, this sort of after-the-fact critique is exactly why the Eighth Circuit cautions against holding a *Franks* hearing for omissions in complex financial cases. *Ozar*, 50 F.3d at 1445-46. In any event, since the difference is immaterial from a probable cause standpoint, it is not grounds for a *Franks* hearing.

Despite the affidavit's detailed explanation of the incredible amount of federal child nutrition program money he and his co-conspirators used to purchase real estate and other items, defendant also claims that the affidavit ignores legitimate food spending. But his affiant only lists expenditures. He does not, and cannot, claim that they were legitimate or that they undercut the probable cause set forth in the affidavit. For example, the affidavit submitted by the defendant's accountant cites a

---

[5]    Again, the government did not have the full account records when it obtained the search warrant in January 2022.

$482,000 payment to Afrique Hospitality Group. Dkt. #188-4 at ¶6. In his brief, Abdulkadir Nur Salah claims that this payment was for the purchase of food (notably, his affiant makes no such assertion). Dkt. #188 at 21. But the owner of Afrique Hospitality Group has been indicted for his role in defrauding the federal child nutrition program, which included created and using Afrique Hospitality Group "to receive and launder Federal Child Nutrition Program funds." *United States v. Abdiaziz Shafii Farah et al.*, 22 CR 124 (NEB/TNL), Dkt. #57 at ¶27. And, indeed, a recent indictment charged former Feeding Our Future employee Ikram Yusuf Mohamed and others with using Afrique Hospitality Group to launder fraudulently obtained federal child nutrition program funds. *United States v. Ikram Yusuf Mohamed et al.*, 24 CR 15 (NEB/TNL), Dkt. #1 at ¶¶87-91. Accordingly, far from undermining the finding of probable cause, inclusion of this transfer of money to Afrique Hospitality Group would only have strengthened it. But either way, defendant has not even attempted to show that this information was "clearly critical" to the finding of probable cause.

Similarly, Abdulkadir Nur Salah claims that the government "ignored" bank records showing Safari used $370,000 to make credit card payments, which he suggests "may have been covering food, supplies, or other operating expenses." Dkt. #188 at 21. He does not, however, provide evidence that this was the case and his affiant does not claim that the expenses on the credit cards were legitimate business and food expenses. For this reason alone, the allegation is insufficient to obtain a *Franks* hearing. In reality, among other things, the Safari Restaurant made

approximately $59,000 in payment on Salim Said's personal Discover card from April to November 2020. The expenses on the card included an array of personal spending, including charges at clothing stores such as Nordstrom, Hugo Boss, and the North Face, and at jewelry/watch stores, such as JB Hudson and Movado. For example, his June 2020 statements looked like this:

| **Transactions** | | | |
| --- | --- | --- | --- |
| TRANS. DATE | PAYMENTS AND CREDITS | | AMOUNT |
| 06/14 | INTERNET PAYMENT - THANK YOU | | -$12,000.00 |
| 07/01 | INTERNET PAYMENT - THANK YOU | | -$1,672.95 |
| TRANS. DATE | PURCHASES | MERCHANT CATEGORY | AMOUNT |
| 06/10 | BILLS GARDEN GOURMET MINNEAPOLIS MN | Restaurants | $76.86 |
| 06/10 | LTF*LIFE TIME MO DUES 888-430-6432 MN 107962896-162D | Travel/Entertainment | $59.46 |
| 06/11 | QUE CHULA ES PUEBLA MINNEAPOLIS MN | Restaurants | $28.56 |
| 06/11 | MCDONALD'S F1761 MINNEAPOLIS MN | Restaurants | $17.13 |
| 06/11 | RESTAURANT DEPOT SAINT PAUL MN | Supermarkets | $372.07 |
| 06/11 | TELEPHONE REPORTING 888-6431757 IL | Government Services | $32.50 |
| 06/19 | NORDSTROM RACK #0275 SAINT LOUIS PMN | Department Store | $90.14 |
| 06/21 | HUGO BOSS BLOOMINGTN BLOOMINGTON MN | Merchandise | $306.00 |
| 06/21 | NORDSTROM #0222 BLOOMINGTON MN | Department Store | $243.25 |
| 06/25 | WALGREENS #4260 HOPKINS MN | Merchandise | $79.98 |
| 06/28 | DORIS UROON RESTAURANT MINNEAPOLIS MN | Restaurants | $16.00 |
| 06/29 | CHEESECAKE EDINA EDINA MN | Restaurants | $149.62 |
| 06/30 | SQ *LA MICHOACANA PURE WASECA MN 0001152921509302501728 | Supermarkets | $58.42 |
| 07/01 | LTF*LIFE TIME MO DUES 888-430-6432 MN 107962896-183D | Travel/Entertainment | $87.20 |
| 07/02 | PARK & LAKE CAR WASH MINNEAPOLIS MN | Automotive | $32.59 |
| 07/04 | CH-EAGAN, MN #186 EAGAN MN | Merchandise | $26.25 |
| 07/04 | CH-EAGAN, MN #186 EAGAN MN | Merchandise | $41.78 |
| 07/05 | KWIK TRIP 00004747691 ANOKA MN | Gasoline | $45.18 |
| 07/06 | BP#9267311 3RD&FRANKLIN B MINNEAPOLIS MN | Gasoline | $64.55 |
| 07/07 | HAMDI RESTAURANT MINNEAPOLIS MN | Restaurants | $28.02 |

The June 14 payment of $12,000 on this personal credit card was made from the Safari Restaurant account. Defendant does not, and cannot, show that inclusion of this sort of credit card statement would have altered the probable cause analysis. Indeed, at best, it looks like Salim Said used company funds to pay many personal credit card expenses. Certainly, the credit card records were not "'clearly critical' to the finding of probable cause" as required to obtain a *Franks* hearing. *Ozar*, 50 F.3d

36

at 1445. Indeed, this sort of back-and-forth is why the Eighth Circuit has held that omissions will "rarely" be grounds for *Franks* relief when complex economic crimes are the subject of the investigation." *Id.*

Defendant also argues that payments made to individuals "could have been consistent with contract labor and management expense payments." Dkt. #188 at 22. Notably, his affiant does not assert that the payments were legitimate labor or management expenses. Dkt. #188-4 at ¶8. This is perhaps unsurprising, since more than one-third of the money on this list—$614,699—was paid to AG Limited LLC, a shell company created and used by Ahmed Ghedi to receive and launder the proceeds of the fraud scheme. *See, e.g.*, Gov't Ex. C, F at ¶¶126-33; Gov't Ex. D at ¶¶89-96. Count 41 of the indictment charges Ghedi with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956, and alleges that he "used AG Limited as a shell company to hide and disguise the source and ownership of his portion of the fraud proceeds." Dkt. #1 at ¶190 ("Between December 2020 and November 2021, AHMED GHEDI deposited more than $2 million in Federal Child Nutrition Program funds into AG Limited LLC bank accounts. GHEDI used this money to purchase more than $245,000 in motor vehicles, to fund more than $200,000 in credit card spending, and to purchase real estate.").

Ultimately, defendant's complaints about the government failing to provide chapter and verse of his various entities' bank accounts miss the mark. The affidavit submitted in support of the search warrants set forth probable cause to believe a crime had been committed. They did not, and did not have to, set forth all the evidence

obtained during the investigation. Absent a substantial preliminary showing that the government knowingly and intentionally made false statements or omitted material information and that a corrected affidavit would not set forth probable cause, he is not entitled to a *Franks* hearing.

Finally, defendant claims that he is entitled to a *Franks* hearing because the government failed to discuss surveillance video showing food being delivered to Safari Restaurant and individual picking up food from Safari Restaurant in December 2021. Defendant did not provide an affidavit or offer of proof regarding the amount of food being delivered as required to obtain a *Franks* hearing. But, even as described by defendant, the video comes nowhere near showing the volume of food delivered that he and his co-conspirators claimed to be serving to needy children. Indeed, the still images he included in his brief show no children at all. For example, he states that on December 17, 2021, video shows "a person with a clipboard meet[] with the drivers/passengers of four separate vehicles lined up in front of Safari, and a second person deliver[] trays and bags of food to all three videos." Dkt. #188 at 29-30. But as explained in the search warrant affidavit, Safari Restaurant had been claiming to be serving 5,000 or 6,000 children a day. Gov't Ex. C, F at ¶¶67-68, 84; Gov't Ex. D at ¶¶30-31, 47. And though it was not included in the search warrant affidavit, since defendant is alleging that the government lied to and misled the Court, the government will note that Safari Restaurant claimed to have served meals to 3,498 children on December 17, 2021, and nearly that many every single day that month.



The photos included in defendant's motions do not show anywhere near that number of people.



Indeed, photos such as these would appear to bolster the probable cause set forth in the search warrant affidavit, not undermine it.

Defendant has not met his burden of making a substantial preliminary showing that the government knowingly and intentionally made false statements omissions and that the affidavits would not have established probable cause if the false information is excised (or the omitted information was included). Accordingly, his motion for a *Franks* hearing should be denied.

### D.    Abdihakim Ali Ahmed's Motion to Suppress

Abdihakim Ali Ahmed has filed a motion to suppress the evidence obtained during the search of his email account. Dkt. #193. The search was authorized by a federal search warrant signed by Magistrate Judge David T. Schultz. The warrant application was supported by a 62-page affidavit setting forth probable cause to search Abdihakim Ali Ahmed's email account. A copy of the search warrant and supporting application is attached as Government Exhibit D.

Abdihakim Ali Ahmed claims that there was not probable cause to search his email account. He does not provide any explanation for how or why probable cause was lacking, or why Magistrate Judge Schultz issued the warrant without a finding of probable cause. To the extent the defendant is asking the Court to conduct a "four-corners" review of the affidavit, the government will rest on the probable cause set forth in the affidavit. Gov't Ex. D. Even if there was not probable cause for the search warrant—and there was—defendant's motion should be denied because the government relied in good faith on a federal search warrant signed by a federal Magistrate Judge. *Leon*, 468 U.S. at 921. Insofar as the defendant provided no reasoning or basis for his motion, the government also believes it may be summarily denied.

Second, defendant claims that the search warrant "was overbroad and lacked particularity" and that the government "exceeded its authorized scope." Dkt. #193 at 5. Specifically, he claims that the warrant authorized the government to seize the entire account and therefore "essentially authorized the whole-sale rummaging through the account." *Id.* This is not true. The search warrant authorized the government to search the defendant's Google account and seize items as authorized by Attachment B. That is precisely what the law requires and what the government did. The affidavit provided probable cause to believe that evidence of a crime—in this case wire fraud in the form of a massive fraud scheme involving the misappropriation of federal food program funds as described at length in the warrant affidavit—will be found in his email account. The search warrant authorized the government to then seize from that account the items outlined in Attachment B. Even if the search warrant was defective in some way—and it was not—the government relied on it in good faith.

Abdihakim Ali Ahmed also requests a *Franks* hearing. But his one-sentence request does not even attempt to make the substantial preliminary showing required to obtain one. Accordingly, his motion should be denied.

### E.    Abdikadir Ainanshe Mohamud's Motion to Suppress

Abdikadir Ainanshe Mohamud has moved to suppress the evidence obtained during the search of his residence in Fridley and his email account. Dkt. #213. Both searches were authorized by federal search warrants signed by federal Magistrate Judges. Gov't Ex. D (email search warrant); Gov't Ex. H (residence search warrant).

41

Nevertheless, he argues that both warrants lacked probable cause and that Magistrate Judges Schultz and Leung erred is issuing them.

To the extent defendant is asking the Court to conduct a "four-corners" review of the search warrant affidavits, the government will stand by the statement of probable cause in the affidavits themselves. Moreover, because the government executed the searches in good faith reliance on the search warrants authorized by federal Magistrate Judges, his motion would fail even if there had not been probable cause (which, of course, there was).

Defendant Abdikadir Ainanshe Mohamud also claims the email search was unconstitutionally overboard and lacked particularity. But contrary to his argument, the search warrant did not authorize the government to "seize large amounts of data and not just specific email threads between subject parties." Dkt. #213 at 3. The search warrant authorized the government to search the defendant's Google account and seize items as authorized by Attachment B. That is precisely what the law requires and what the government did. The affidavit provided probable cause to believe that evidence of a crime—in this case wire fraud in the form of a massive fraud scheme involving the misappropriation of federal food program funds as described at length in the warrant affidavit—will be found in his email account. The search warrant authorized the government to then seize from that account the items outlined in Attachment B. Here, too, the government relied on the warrant and its terms in good faith so even if there was a problem with the warrant (and there was not), his motion would fail.

Finally, defendant asks for a *Franks* hearing. But he has not come even closely to making the substantial preliminary showing that there was a knowing and intentional false statement in the search warrant affidavit and that the affidavits would not establish probable cause if the information was excised from the affidavit.

In his motion, he claims that the affidavit falsely accused him of sending an emailing meal counts for the Stigma-Free Willmar site to Aimee Bock. Specifically, he claims that "he was not the owner of Stigma-Free and he denies sending emails directly to Ms. Bock about counts." Dkt. #213 at 3. His denial is puzzling. Here is the described in the affidavit, in which Abdikadir Mohamud sent an email with the subject line "Willmar Meal Count/Invoice for September."

> **From:** Abdikadir Mohamud <a.mohamud15@gmail.com>
> **To:** aimee@feedingourfuturemn.org, claims@feedingourfuturemn.org
> **Subject:** Willmar Meal Count/Invoice for September
> **Date:** Thu, 02 Sep 2021 16:54:55 -0500
> **Attachments:** Willmar_September_Meal_Count_(Breakfast).pdf;
> Willmar_September_Meal_Count_(Lunch).pdf; Willmar_September_(Invoice).pdf
> _____
>
> Hello,
> Attached are the meal count sheet/invoice for the month of September.
>
> --
> Abdikadir Mohamud
> "No amount of guilt can change the past and no amount of worrying can change the future"
> -Omar Al Faruq

Gov't Ex. J. As described in the search warrant affidavits, "attached to the email were "Summer Meal Counts" claiming that Stigma Free served 2,000 meals a day, seven days a week during August 2021 in Willmar, Minnesota." Gov't Ex. D at ¶64; Gov't Ex. H at ¶100.

**FEEDING OUR FUTURE**

**SUMMER MEAL COUNTS – CLICKER**

| Sponsor | FEEDING OUR FUTURE | Email | aimee@feedingourfuturemn.org | Phone | 612.345.4922 |
| Site | STIGMA FREE WILLMAR | Supervisor | Abdikadir Mohamud | Week of | 08/15/2021 |

| Meal Type | ✓ BREAKFAST | | | LUNCH | | | | |
|---|---|---|---|---|---|---|---|---|
| Available Meals | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
| Number of meals received/prepared | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 14000 |
| Number of meals from yesterday | 45 | 6 | 7 | 6 | 8 | 0 | 0 | 25 |
| Meal Counts | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
| Number of firsts served to children | 1994 | 1995 | 1993 | 1992 | 1998 | 1999 | 1993 | 13938 |
| Number of second meals served to children (not reimbursed) | 5 | 6 | 4 | 5 | 4 | 5 | 8 | 0 |
| Number of meals served to program adults (not reimbursed) | 5 | 4 | 4 | 5 | 8 | 4 | 5 | 10 |
| Number of meals served to non-program adults (not reimbursed) | 8 | 6 | 5 | 8 | 4 | 4 | 0 | 10 |
| Number of children requesting meals if food is gone | 17 | 12 | 10 | 7 | 9 | 17 | 13 | |
| Food | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
| FOOD TEMPERATURE | NA | NA | NA | NA | NA | NA | NA | |
| Number of non-reimbursable, incomplete or damaged meals | 05 | 6 | 05 | 5 | 5 | 0 | 0 | |
| Number of leftover meals | 0 | 5 | 0 | 0 | 0 | 5 | 0 | |
| Initials of person taking daily meal count certifying that the information is true and accurate | Aw | Aw | Aw | Aw | Aw | Aw | Aw | |

SITE SUPERVISOR: By signing, I certify that the above information is true and accurate.

| Signature | [signature] | Date | 08/21/2021 |

Elsewhere in his motion, Abdikadir Mohamud claims "the affidavit does not allege Mohamud conducted meal counts or collected attendance himself." Dkt. #213 at 3. Perhaps not, but the meal count sheet discussed in the affidavit was emailed to Aimee Bock from defendant Mohamud's email account and containing his signature as the site's "supervisor." Gov't Ex. D at ¶64; Gov't Ex. H at ¶100.

The fact that the search warrant at one point refers to Abdikadir Mohamud as the owner of Stigma-Free, as opposed to the supervisor was a typo. As defendant concedes in his motion, the affidavit elsewhere clearly identifies Ahmed Artan as the owner of Stigma-Free and Abdikadir Mohamud as the owner of Tunyar Trading— which the affidavit describes as a meal vendor company that received more than $3 million from Stigma-Free. Gov't Ex. D at ¶¶58-66. And the meal count sheets identify him as the site's "supervisor." Gov't Ex. D at ¶143 ("Abdikadir Mohamud was listed as the site supervisor for Stigma Free Willmar"). In any event, an error like this does not garner a *Franks* hearing unless the defendant can show both that the false statement was made "knowingly or intentionally" or in "reckless disregard of the

truth" *and* that "the affidavit no longer establishes probable cause" without the error." *Arnold*, 725 F.3d at 898. There is no question probable cause would exist without the error.

Contrary to defendant's claim that he never sent meal counts to Aimee Bock, the search warrant affidavits go on to describe another occasion in December 2021 in which Abdikadir Mohamud emailed meal counts to Aimee Bock. Gov't Ex. D at ¶142.



If defendant Abdikadir Mohamud wants to argue at trial that someone else used his email account to send these emails and/or forged his signature on the meal counts, he is welcome to do so. But such claims are not the basis for a *Franks* hearing.

## F.    Ahmed Ghedi's Motion for a Franks Hearing (Dkt. #205)

Finally, defendant Ghedi moves to suppress and requests a *Franks* hearing related to the search of 2722 Park Avenue. As an initial matter, it is not clear that defendant Ghedi has standing to challenge this search warrant. As explained in the search warrant affidavit, 2722 Park is a large historic mansion that has been converted into office space. Gov't Ex. H at ¶17. The office has been used by several companies that have received and misappropriated federal child nutrition program

funds, including Stigma-Free International, Olive Management, Cosmopolitan Business Properties, and TFS Auditors. *Id.* at ¶¶18-23.

In his motion, defendant Ghedi does not claim that he had any ownership or privacy interest in the search site. Instead, he states that he wants to join in a motion to suppress this search if the government "actually seized any records belonging to Mr. Ghedi during this search." Dkt. #205 at 1. Unless he can identify a Fourth Amendment-protected privacy interested in this office, his motion should be denied for lack of standing.

Even if he had standing, Ghedi's two-page motion does not identify any factual misstatements in the affidavits supporting the search warrants. Because he has not even attempted to make the required substantial preliminary showing, he is not entitled to a *Franks* hearing and his motion should be denied.

## III. CONCLUSION

The government respectfully requests that the Court dispose of defendants' pretrial motions as suggested above.


Date:  February 23, 2024                    Respectfully submitted,

                                            ANDREW M. LUGER
                                            United States Attorney


                                     BY:  */s/ Joseph H. Thompson*
                                            JOSEPH H. THOMPSON
                                            HARRY M. JACOBS
                                            MATTHEW S. EBERT
                                            CHELSEA A. WALCKER
                                            Assistant U.S. Attorneys